## Planters' Bank *v.* Snodgrass.

To constitute usury, there must be an agreement between the lender and the borrower of money, by which the borrower knowingly gives or promises, and the lender knowingly takes or reserves, a higher rate of interest than the law allows, and with an intention to violate the statute.

It seems, that if a special verdict of a jury find that there is an agreement by which the lender knowingly takes illegal interest, the court may infer an intention to violate the statute; but this inference can only be indulged, when no other conclusion would be consistent with the facts found in the verdict.

Where it appeared that a Bank had used Rowlett's tables in the calculation of interest, which reckoned three hundred and sixty days to the year; but the jury found in a special verdict, that, this mode of calculation had never been sanctioned by the directors, or stockholders directly, and was only adopted by the officers of the Bank, because it had been uniformly used by Banks, and that there was no intention to violate the law, the object being convenience in business; and that there was no design to gain by the tables, held their use did not constitute usury.

It seems, that the universality of the custom of using Rowlett's tables, and the small excess of interest gained thereby, repel the usurious interest.

Where in the adjustment and renewal of a claim, an additional amount was voluntarily paid, and included on account of expenses, and not as the condition of the loan, it was held not to affect the contract with usury.

IN ERROR to the circuit court for the county of Adams.

Trial before the Honorable George Coalter.

This was an action of assumpsit, brought on a promissory note of *C. Dart to defendant for $124,068 51, dated 15th June, 1835, and payable eighteen months after date, negotiable at the Planters' Bank, &c. at Natchez, and endorsed by defendant, and several others in succession, as set forth in the declaration, to plaintiffs.

The declaration was filed in the common form, in the circuit court of Jefferson county, to the June term, A. D. 1837, and contained a count on the note, and the common money counts on an account filed with the declaration for the amount of the note as money loaned, &c. &c.

The defendants plead the general issue to the whole declaration, and a special plea to the first count as follows in substance: "that

defendant endorsed the note sued on at the instance and request of the maker, to enable said maker to obtain a loan of money from plaintiffs; that on the 15th June, 1835, the said maker presented said note to plaintiffs for discount at the rate of eight per cent. per annum interest thereon, which was refused by plaintiffs at that rate; that the said maker again on the same day, presented said note, and it was corruptly and unlawfully agreed, by and between plaintiffs and said maker, that said plaintiffs would receive and discount said note at a greater rate of interest than eight per cent. per annum, and for the forbearance and loan aforesaid, the said maker would pay said promissory note when due; that in pursuance of said corrupt and unlawful agreement, said note was delivered to said plaintiffs by said maker, and said plaintiffs loaned said maker thereon the sum of $106,349 42, and demanded and received of and from said Dart (maker) the sum of seventeen thousand seven hundred and nineteen dollars and nine cents, for interest thereon; that on said loan said plaintiffs did demand and receive of and from said maker, the sum of $27 22½ for interest thereon, more than the lawful interest at the rate of eight per cent. per annum, and that the consideration of said note was illegal and the note void."

At the February special term, A. D. 1837, the plaintiffs filed a demurrer to the special plea, and showed for cause:

1. The plea does not show what rate of interest was charged or exacted, &c.

2. Plea does not show what amount of interest or discount was taken by plaintiffs.

3. It was not unlawful or usurious for said Bank to receive and take a greater rate of interest or discount than at the rate of eight per cent. per annum.

4. It was not unlawful or usurious for plaintiffs to discount said note or loan the maker money thereon at a greater rate of interest or discount than at the rate of eight per cent. per annum.

The defendants joined in demurrer, and the case was transferred, by consent of all parties, and the order of the court, to Adams county.

At the July special term of the circuit court of Adams county, the demurrer to said plea was overruled, and by consent, leave

was given to plaintiffs to reply to said plea and a general replication was thereupon filed, and the case put to trial at said term, on said pleas of the general issue and said special plea, replication, &c.

The jury found the issues for plaintiffs, and assessed their damages to $139,783 85.

At same time defendant filed a motion for a new trial, on the ground that the verdict was contrary to law and evidence and the charge of the court.

On agreement, the motion was sustained and a new trial granted.

The plaintiffs then tendered their bill of exceptions to the opinion of the court in sustaining said motion, and it was enrolled as a part of the record.

The bill of exceptions sets forth all of the testimony offered by both parties on the trial of the issues, as follows in substance:

The plaintiffs proved the note sued on with the endorsements thereon, and the regular demand for payment and refusal to pay the same, and due and legal notice to the defendant of all facts necessary to charge defendant in the first instance.

Defendant then proved that plaintiffs had before the date of the note sued on, commenced several actions against Dart, (the maker,) and the defendant and one of the other drawers, on bills of exchange and promissory notes then due and protested, which suits were compromised by plaintiffs and defendants, and the note sued on was discounted by the bank in satisfaction of the balance due on them to plaintiffs.

That on the said compromise defendants allowed the sum of $2500, over and above the interest and costs of suit, to pay plaintiffs' attorneys' fees, and this was done voluntarily by defendants and not exacted as a condition precedent to said settlement, and the discount of the note sued on.

That the nett proceeds of said note sued on, were passed to the credit of said Dart, and applied to the payment of said protested paper. That said nett proceeds were discounted by deducting in the calculation from the whole amount of the note, eight per cent. per annum interest, for the whole time said note had to run from date to maturity.

That said interest was calculated according to the rule in Rowlett's tables for calculating bank interest, estimating the year at 360 days. That in ascertaining the time for which interest was to be calculated on this note, the whole number of days was estimated, including 3 days of grace, in all 552 days, and the interest reserved on said calculation was $15,219 09, and the sum by the bank passed to the credit of Dart, was $108,849 42.

That the above mode of calculating interest was the one uniformly pursued by the bank, and was adopted for the purpose of convenience merely, and not with any design to evade the usury laws, or to take a greater rate of interest than is allowed by their charter.

That the directors of said bank knew nothing of the mode of calculating interest, and never gave any directions concerning it, but the officers of the bank knew that this mode of computation gave a fraction more than the ordinary mode, by years and months, at the rate of 360 days or twelve months to the year.

That there was no specific agreement by the parties on the subject of interest, nor was any thing said about it; but the calculation was made by one of the clerks, according to the custom of the Bank, and a settlement accordingly.

Said note sued on was never offered to the Bank for discount and refused at a less rate of interest than that at which it was discounted. And no part of said note or interest has been paid to plaintiffs.

The above was all the testimony offered in the case.

Afterwards, at the same term of court, (July special term, A. D. 1838,) all parties agreeing, the case was again submitted to the jury, who returned a special verdict, as follows:

" We the jury find that the plaintiffs had, previous to the date of the note sued on in this action, commenced several suits against C. Dart, the drawer of said note, and the defendant and one of the other drawers on bills of exchange and promissory notes then due and protested, which suits were compromised by the plaintiffs and defendants, and the note on which this suit is founded was discounted by the Planters' Bank, in satisfaction of the balance due on them to the plaintiffs; that on said compromise the said defendants allowed the sum of twenty-five hundred

dollars over and above interest and costs, and costs to pay the plaintiff's attornies' fee.

That the nett proceeds of the notes sued on was passed to the credit of said C. Dart, and applied to the payment of said protested paper, which nett proceeds was discounted by deducting in the calculation from the whole amount of the note eight per cent. per annum interest, for the whole time said note had to run from its date to maturity. That this interest was calculated according to the rules in Rowlett's Tables for calculating bank interest, which estimates the year at 360 days only, and that in ascertaining the term for which interest was to be calculated on said note the whole number of days were estimated, including three days of grace, which was five hundred and fifty-two days; and the interest reserved by such calculation was fifteen thousand two hundred and nineteen and 9-100 dollars, and the sum which was by the said Bank passed to the credit of said Dart, was one hundred and eight thousand and eight hundred and forty-nine 42-100 dollars. The mode of calculating interest which was pursued in ascertaining the interest on the note sued on was the uniform mode of calculating interest in the Planters' Bank, and was adopted for the purpose of convenience merely, and not with any design to evade the laws of usury, or to take a greater amount of interest than allowed by the charter. The directors of the Bank knew nothing of the mode of calculating interest, and never gave any directions concerning it; but the officers of the Bank knew that the mode of calculating interest pursued by the Bank gave a fraction more interest than the ordinary mode of calculating by years and months, at the rate of 365 days to the year, and twelve months to the year. There was no agreement specifically made by the parties on the subject of interest, nor was any thing said about it. But the calculation was made by one of the clerks according to the custom of the Bank, and a settlement accordingly at the maturity of the note, (on the 18th December, 1836,) it was duly presented and payment demanded at the Planters' Bank of Mississippi, at Natchez, which was refused, and due and legal notice of such demand was given to the defendant by mail, directed to Rodney, Mississippi, which was the post-office nearest to his place of residence, and put in the

post-office at Natchez, in time to go out by the first mail after the payment was demanded.

We find further that the $2500 was a sum allowed voluntarily by the defendant, and that said sum was not exacted as a condition precedent to the settlement and discount of said note sued on in this cause.

That said note was never offered for discount at a less rate of interest than that at which it was discounted and refused.

And no part of the note sued on, or the interest, has been paid to plaintiffs. If, upon these facts, the law be in favor of the plaintiffs, we find for the plaintiffs, and assess their damages at one hundred and thirty-nine thousand nine hundred and eighty-three 85-100 dollars; but if the law be in favor of the defendant, then we find for the defendant."

The case stood regularly continued till October term, A. D. 1838, when the court being of opinion, after deliberation, that the law was for the defendant upon the special verdict, ordered the verdict and judgment to be so entered, and it was done.

The case is brought up by writ of error, and the errors assigned are:

1st. The court erred in overruling the demurrer to defendant's second plea.

2d. The court erred in granting defendant a new trial.

3d. The court erred in giving judgment on the special verdict for defendant, the law being with plaintiffs.

McMurran & Boyd, for plaintiffs in error.

The counsel in the opening of these causes, on behalf of the plaintiffs in error, submitted to the consideration of the court, three general propositions, the maintenance of either of which would, it was conceived, entitle the plaintiffs to a reversal of the judgment of the court below, and to the judgments of this court for the debts claimed by the plaintiffs.

1. That the plaintiffs have not been guilty of usury or a violation of their charter.

2. That if the mode of calculating interest did amount to usury, the excess alone would be deducted. The contract would not be thereby avoided.

[Planters' Bank *v.* Snodgrass.]

3. That the court below clearly erred in granting new trials, after verdicts of the jury, in favor of the plaintiffs.

First, then, the *rate* of interest taken was that allowed by the respective Bank charters.   In the one it is fixed at six per cent. per annum; in the other, on a note having the time to run which the one sued on had, it is fixed at eight per cent. per annum.   3 Story's Laws, United States, 1554, Rule 9.

The original act chartering the Planters' Bank, passed in 1830, did not fix the rate of interest or discount on loans, except those secured by mortgage.   See act of 1830, page 92.   The amendatory act of December 23, 1831, regulated discounts upon personal security, at seven per cent.   But the act, amendatory thereto, passed in 1833, empowered the Bank to make discounts upon notes or bills, having more than twelve months and not exceeding twenty-four months to run, at the rate of eight per cent. per annum: and it was under this amendatory provision of the charter, that the discount was made in the present instance.

But the answer of the opposite counsel to this is, that, although we may have calculated the interest according to the *rates* fixed by the charters, yet we calculated by Rowlett's tables, allowing but 360 days to a year, and 30 days to a month; that we adopted an erroneous standard, by which we reserved, in the case of the United States Bank, $118 88 cents more than the law allowed, and that in the case of the Planters' Bank we reserved (including $2,500 for counsel fees) $2,722 16 cents more than the law allowed; and therefore conclude they, we have been guilty of usury.

And what is usury?  Does it depend upon legislation, or exist independently of all statutory regulations?  We contend, whatever difference of opinion may have existed in early times, in England and other countries, upon this subject, it now depends upon the statute law.   If there be no statute, the lender can take any reasonable sum for the use of money, in the same manner as rent for the use of a house; and that it is only when the statute is violated that usury can be committed.   8 Bac. Abr. 312, Title Usury; 2 Blac. Com. 454, 464; Grotius Lib. ix. cxii. sec. 20.

What then is usury?   All the authorities concur, that there must be a *corrupt agreement* between the parties at the time, whereby

the one receives or reserves a greater rate of interest for the loan of money or for the forbearance of the day of payment than the law warrants. It is the *corrupt intent*, the *quo animo*, entering into the transaction at the time, that must govern. Without this ingredient usury cannot exist. This too, must be explicitly proved, and is for the consideration of the jury and not the court. The pleas of the defendants in these cases, as well as the authorities cited, among others, most clearly establish this. Thus, in Cro. El. 643, Bretton *v.* Downham, the court say, " the corrupt agreement (which is confessed by the demurrer,) makes it usury; and it is the *intent* that makes it to be so, or not so," so in Murray *v.* Harding, 2 W. B. 865, Gould, Justice, says that the ground and foundation of all usurious contracts, is the corrupt agreement.

In 1 Vesey, jr. 531, Lord Commissioner Ashurst expresses himself in so many words: "To make the contract usurious it must be "apparent, either upon the face of it, or by evidence, *that the in-* "*tention of the parties in the creation of it* was by means of "shift or device to take more than legal interest for the loan or "forbearance of money." See to the same effect Cro. Jac. 507— Bos. & Pul. 144, 156, Hammet *v.* Yea.

And there must be a positive agreement, the minds of both parties must be brought to the act, and must act on the transaction knowingly and wilfully, both must clearly concur at the time in the commission of the act, which amounts to usury—and this too is not to be left to implication or inference. To use the language of one of the judges, to be found in 3 Wend. R. 64, it must enter into the very concoction of the transaction. Thus the Supreme Court of Connecticut, in the case of Smith *v.* Beach, 3 Day's Rep. 268, 271, determine, "that a corrupt agreement is essential to con- "stitute usury; and to form a corrupt agreement, as in all other "contracts, the minds of the parties must meet. The assent of "Beach, (the borrower) was therefore as essential to the existence "of a usurious agreement as that of Bird (the lender.) From "these premises it follows as an undeniable consequence, that there "could be no corrupt agreement while either of the parties remain- "ed ignorant of the excessive reservation; and the jury ought to "have been so instructed." 2 Call's Rep. 92.

[Planter's Bank *v.* Snodgrass.]

One man may commit a homicide, but it requires two to make out the offence of usury; it requires two to make an agreement, legal or illegal.

It is unnecessary to multiply authorities upon this point, the books are full of them, and they all hold the same language. We however will refer to the case of the Bank of the United States *v.* Waggener, *et al.* reported in 9 Peters' Rep. 378, 404. We think the doctrine laid down there peculiarly applicable to the cases now before the Court. Judge Story, in delivering the opinion of the Supreme Court of the United States, after recognising the principle we have laid down, proceeds to state, that "the same principle would seem to apply to the prohibition in the charter of the bank. There must be an intent to take illegal interest, or, in the language of the law, a corrupt agreement to take it in violation of the charter, and so it was stated in the plea in the case of the Bank of the United States *v.* Owens, 2 Peters, 527. The *quo animo* is, therefore, an essential ingredient in all cases of this sort. Now, it distinctly appears in the' evidence, as has been already stated, that no interest or discount whatsoever was actually taken on the note; and on the face of the note, there was no reservation of any interest but legal interest, so that there has been no taking of usury, and no reservation of usury upon the face of the transaction. The case then resolves into this enquiry: Whether upon the evidence, there was any corrupt agreement, or device, or shift, to reserve or take usury? and in this aspect of the case, the *quo animo,* as well as the acts of the parties, is most important."

Now, compare the evidence contained in the records with these authorities, these acknowledged principles of law. There is not the slightest proof of any agreement at all, as to the rate of interest, or the mode in which it was to be calculated, between the Bank or Directory and the defendants; it does not appear that a word passed upon the subject. The reverse is the testimony. The directors knew nothing about it, and there is no taking or reservation of interest upon the face of the note. Rowlett's Tables were never adopted by the Banks—but the cashier or clerks adopted the Tables themselves, as a rule of convenience, and to ensure accuracy; being as near the divisions of time, avoiding fractions, as can be arrived at. Besides, it is a usage not only of

49*

Banks, but of merchants and all men of business, and the testimony is explicit that the tables were used as already stated for the sake of convenience and accuracy, *and without any corrupt intent, without any design to violate the charters of the Banks, or to commit usury.* The proof too is that it is not known who filled up the note or calculated the discount. The Directors did not know how much interest was reserved, and how much of the proceeds applied to taking up the protested paper. There is an entire ignorance and absence of all facts necessary to constitute usury, or a contract to take usury, and of all intention to commit usury. As far as negative proof can establish the reverse, it is clearly established in these cases.

There is not the slightest evidence that any excess of interest entered into the inception of the notes, or that they were prepared by agreement to be discounted, but simply that they were offered, for the sums on their face for discount, and discounted accordingly, as if they related to any other transaction. All the ingenuity of counsel cannot torture the proof into any thing more or less than we have stated it to be. And it shows that the Banks, Directors, Cashiers, Clerks, defendants and all concerned, no more contemplated usury in these transactions, than they at the time contemplated murder or any other felony. How then, could the jury, according to the law and the testimony, do otherwise than they did in their general verdicts, find against the defence of usury.

Again. As the proof shows that the stockholders and directors did not adopt Rowlett's tables, as a standard for computing interest, are they guilty of usury because their clerks did, unknown to them? The corrupt intent must be brought home to the stockholders and directors, and not merely to their agents, even if it could be fixed upon the latter. In support of this position, see the case of Dognall *v.* Wyley, 11 East, 43—45. 1 Campb. 149.

But further; this rule of calculating interest, according to these Tables, is shown to be a universal usage among banks, merchants, and men of business generally. And is this to have no weight with the court? The ablest Judges have recognised usage or custom, (which is the basis of all common law,) as important in decisions upon questions involving the usage. Lord Mansfield in the case of Floyer *v.* Edwards, sanctions this doc-

[Planters' Bank *v.* Snodgrass.]

trine, and uses the very expressive and emphatic language, that *it tends greatly to explain a transaction.* 1 Cowper, 112. How forcibly, how pointedly does this language of one of the most eminent Judges that ever lived, apply to these cases? How satisfactorily does the usage, which has been shown to exist, explain these transactions, explain how this alleged excess of interest arose? Usage, therefore, the inconvenience that would result from a contrary decision, the losses that would arise, have caused the courts to decide in conformity with the usage, although the decision strictly, may come in conflict with a positive law. 2 W. B. 793, Floyd *v.* Williams. In the case of Brown *v.* Harradin, 4 T. R. 148, Lord Kenyon in discussing the question whether promissory notes were entitled to the three days of grace, by virtue of the statute of Anne, goes into a consideration of the consequences that would follow from a decision that they were not entitled to the days of grace; the usury that parties would be innocently involved in, and the debts that would be lost from want of legal notice to endorsers.

Thus, taking interest *in advance,* is clearly in violation of the usury laws, but the courts, both in England and America, decide that this practice does not amount to usury. It prevails universally, and judicial decisions place the question now beyond doubt. In addition to the authorities cited, which have put the question at rest in England, the case of the Bank of the United States *v.* Fleckner, in 8 Wheaton 354, and 3 Peters 40, among many others unnecessary to recite, will show that the question has been as fully settled in this country. And therefore although taking discount, or the interest in advance, gives the lender on every hundred dollars, for a twelve months, at ten per cent. one dollar more than the law strictly entitles him to, still it is sanctioned by the whole current of authorities, and is not now to be disputed. Surely, then, the usage universally adopted, in using Rowlett's Tables, is entitled to a much more favorable consideration than the one we have referred to. The one is adopted to insure accuracy, from necessity in fixing a uniform rule upon the subject of calculating interest: in the other case there is no necessity, or inconvenience to be urged, for the interest could be calculated just as well when the period of the loan terminated as when it

commenced; and besides the difference is much more considerable in the latter instance.

But we will now come to a number of decisions of the very highest authority upon this very point; where the question arose directly, whether the computation of interest, by Rowlett's Tables, allowing 360 days to a year, 90 days to the fourth of a year, and thirty days to, a month, was or was not usury. These authorities are so clear, so full and decisive, that they require little or no comment of counsel. We refer to Judge Harper's manuscript opinion delivered in the United States District Court of Louisiana. 1 Stuart's Alabama Rep. 442,56,62,67. 1 Devereux's N. C. Rep. 100, 128. Also the opinion of the Supreme Court of Virginia, in the case of the Bank of North Carolina, *v.* Cowen, in manuscript, contained in the last published volume of Leigh's Reports. The reasoning of the able judges, composing that court, is most strong and most applicable. A decision to the same effect, directly on the legality of using Rowlett's Tables, has been lately made by the Supreme Court of Connecticut. See 11 Con. Rep. 495. Supreme Court of Massachusetts have given the same decision, 12 Pick. Rep. 586, (Agricultural Bank *v.* Bissell.) In that case, the court, in the conclusion of their opinion, say, " the intent was to compute and raise the interest for the sixty days and grace. The period of sixty days is one-sixth of a year, as nearly as can be computed without a fraction, and three days is the nearest approximation, to the 10th part of a month, or the 120th part of a year, without fractions of a day. Upon this view of the case we are of the opinion that it is not shown that usurious interest was taken contrary to the provisions of the statute, and that the defence is not sustained." Again, in speaking of the usage, with regard to these tables, in another part of the opinion, the court say: " Such being the universal practice of other persons, as well as banks, we think a jury would not be warranted, from the mere fact that the interest, thus computed, slightly exceeds the legal rate, to infer a corrupt and usurious agreement." So the question has been settled in the same way in the state of Vermont. 1 Ver. Rep. 399, 430. And this decision of the supreme court of Vermont reviews critically, and repudiates, (as all the cases just cited do,)

the decision to be found 2 Cowen's Rep. 712, 769, the only decision, which determines the use of Rowlett's Tables in computing interest to be illegal.   And this very decision too, by the supreme court of New York, bows to the supremacy of usage in other cases when sanctioned by judicial decisions.   Chief Justice Savage feels bound to submit to it in reference to the taking of interest *in advance,* although he says, it is a palpable violation of the usury laws.   Now if that court could have had before them, the authorities which we have just read, authorities in six of the cases, made in six of the highest tribunals of different states of the Union, they would inevitably have been brought to the same conclusion on this point, according to the reasoning of judge Savage himself.   And with these authorities, at this late day, how can this court come to any other decision than that for which we contend.   1 Wend. 556.

But it is also alleged with regard to the case of the Planters' Bank, against Snodgrass, that we charged $2500 for counsel fees, improperly.   The proof is that this sum was voluntarily allowed upon the compromise of the suits upon the old protested paper; it was designed as a remuneration of part of the expense incurred by the bank, and was not exacted even as a condition of the subsequent arrangement, by which the note sued on was given.   This certainly has not a vestige of usury about it, and we will refer to but a single authority, Auriol *v.* Thomas, 2 T. R. 52.

And with the failure to establish this sum of $2500 as usury the plea and defence must fall to the ground.   This sum is blended with the alleged excess according to Rowlett's Tables, and the precise amount specified must be established, or the plea cannot be sustained.   Comyn on Usury, 92; 8 John. Rep. 84.

Again, we are told the Planters' Bank violated her charter in taking the interest in advance for the whole time the note had to run; that twelve months was all the charter allowed, but that it was taken for eighteen months.   Such is not the charter; see the first section of the amendatory act of 1833, already referred to.   It empowers the bank to make *discounts* on paper having under 12 months to run, at 7 per cent. and on paper, having a greater length of time to run, but not exceeding 24

months, at the rate of 8 per cent. per annum; and then provides that the bank may make loans for 1, 2, and 3 years, renewable annually, and may require on renewals additional security; and provides that on such *loans,* (not discounts) interest shall not be taken for more than 12 months in advance. The very power to discount paper, having less than 24 months to run, does *ex vi termine,* give the bank the right to take the discount for the whole in advance. How could the board of directors discount the *same* note a second time at the end of twelve months? The debtor would have all the proceeds when first discounted, and there would be nothing left for a second discount. The bank read its charter as we do, and beyond doubt correctly.

We will now proceed to the second proposition, which we submitted in the outset of this discussion. Admitting, for argument sake, and in contradiction to all the authorities, except that in 2 Cowen, that although the stockholders, and even the directors their trustees, knew nothing of the mode of computing interest, used by the cashier or clerks of the banks, still that it was a violation of law, and amounted to usury in the stock holders, (for they are the bank,) yet we contend that the contract is not thereby avoided; that the excess of interest alone can be deducted, and that the notes remain valid securities for the debt.

And in the first place, let us refer to these bank charters. Do they contain any penalty, any forfeiture, when more than six per cent. in the one case, and eight per cent. in the other, shall be received or reserved? The amendment to the Planters' Bank Charter, under which the interest in this instance was reserved, and which was passed in 1833, is an enabling statute, it confers power and inflicts no penalty. So the U. States Bank Charter merely contains a prohibition upon the subject of interest. It does not say that where a greater rate of interest is taken or reserved, the contract shall be void. Not at all. And when the legislature intend a penalty shall be annexed to a violation of their laws, that body, and not the court, affix it. This we see fully exemplified in this same United States Bank charter. See sections 11, 12, 13, 17, of that charter, as to penalties.

The authorities are conclusive, that the court never creates

penalties, and a heavier one could not be inflicted upon a banking institution, than the avoidance of the debts due it. It is an act of legislation, and not to be implied by any court. 1 Mass. Rep. 167; 2 John. R. 379.

If the Bank has violated her charter, the remedy must be applied by the government, but the contract between her and the citizens when within the bounds of her charter, must be enforced. This has been expressly decided by the supreme court of the United States in the case of Fleckner *v.* Bank of the United States, 8 Wheat. Rep. 355; and it is the acknowledged law of the land.

But the opposite counsel contend that, as the Bank is the creature of its charter, and all its powers derived from the charter, in discounting notes or bills at a greater rate of interest than it allows, the Bank exceeds its authority, and the act is a nullity. Not so : The power of the Bank to discount paper is not derived from the clause in the charter regulating interest; it is conferred by distinct substantive provisions, which are not destroyed by the mere circumstance of taking an excess of interest. . If the charter had prohibited loans altogether, then a loan would be void, for it would be in violation of the charter. But when the power generally to discount notes and bills is conferred on a Bank to the extent that a citizen possesses the power, the effect of taking too much interest would be the same in both cases; if the law affixed no penalty, the excess alone would be deducted, the illegal would be separated from the legal, and the security would stand for that which was legal. The Planters' Bank charter provides that that Bank shall discount paper ; at seven, eight, or nine per cent., according to the nature of the loan or discount. Now if the validity of her loans depended on the provisions of her charter fixing the rate of interest or discount, the contract would be equally as void when she took too little, as when she took too much. The rule would have to work both ways, and carries its absurdity upon its face.

Again, we are told that the notes are void upon general principles, and in support of this we are referred to the case of the United States Bank against Owens and others, in which Judge Johnson delivers the opinion of a majority of the court, to be found in 2 Peters' Rep. 527. We confess that the reasoning of the Judge

is not very clear to us, but if we comprehend the decision correctly, it proceeds upon the ground that a fraud had been perpetrated upon the charter of the United States Bank, or upon the usury laws of Kentucky.  The case came before the court on a demurrer to the plea of usury, admitting a corrupt agreement, by which the Bank received Owens' note for the sum loaned, *in depreciated Kentucky paper, upwards of forty per cent.* below specie value, which amounted in fact to an interest of upwards of fifteen per cent. per annum.  This was considered and so decided by the court, to be a shift, a device to evade the legal rate of interest. The demurrer admitted every odious averment in the plea, and a majority of the court decided the transaction, thus admitted, *to be a fraud upon the statute, and void.*  But if the rate of interest had been expressed, and if the Bank had not admitted by her demurrer that she had resorted to the use of depreciated paper as a cover for upwards of fifteen per cent. interest, the court could not have decided that there was any shift, or device, or fraud, but a simple, direct, violation of the law, and the court would not have given the decision they did.  The cases cited by Judge Johnson are not at all analagous to the present.  The letting a house for immoral purposes, wagers upon elections, insurances on illegal voyages, these and all such cases, have no bearing upon the causes now before the court.  The cases referred *to, strike at the very root of* the contracts; here it is not so, the charters authorise a loan, and the interest is but an incident.  Now, if a corporation attempted *to do an act not authorised by its charter*, such as a Bank insuring property, the policy no doubt would be void; but when general banking powers are conferred, we know no law or justice, that would sanction the position, that the loan or the note was absolutely *void*, when the corporation merely exceeded the interest allowed by the charter, and when there was no shift, no device, no attempt at a fraud upon the statute.  This authority, therefore, we conceive, has no application to the cases under consideration; and if it had, it would be found to be so modified and explained when the same cause came before the court again in a new aspect, that it could have but little weight with this court. The cause was returned to the court below, the unfortunate demurrer was abandoned, the parties took issue to the jury upon

[Planters' Bank *v.* Snodgrass.]

the question of usury, when all the facts came before the court, a second time ; and in the second decision, which will be found in 9 Peters' Rep. 398, 399, the law applicable to that case was fully discussed and finally settled by the court. This decision is worthy of a most careful examination ; it expressly decides that the court deliberately adhere to their decision in Fleckner's case, which, among other things determines that the contract between the parties remains inviolate ; that the word " *take*" in the charter does not embrace " *reserve ;*" and well may we apply this decision to the causes now before the court. For the records show that the plaintiffs have not taken a cent. Then the United States Bank charter has not been violated, and as to the Planters' Bank charter, it confers power instead of restricting it, as already stated. So also the opinion in 9 Peters, proceeds to examine the case " in reference to the usury act of Kentucky, and the article of the Bank charter," fixing the rate of interest.

Indeed the point is too well settled, that the usury laws of the country, where the transaction takes place, will apply to it, no matter who may be the perpetrators, banks, citizens, or non-residents. In the conclusion of the opinion of the court, contained in 3 Peters' Rep. 36, 42, the court say, that " upon the other point suggested in the cause, whether banks are within the statute of usury, we entertain no doubt that they are." 15 John. Rep. 338, 358, as well as all the other authorities, where the question has arisen, is directly in point. Indeed, the very case so much relied on by the opposite counsel, from 2 Cowen, is decisive upon this point. Both the court and the counsel say that as the interest laws of New York fix it at 7 per cent. most of the banks cannot be guilty of usury, for their loans are made at 6 per cent. and although they receive more than six, " yet the difference is not such as to amount to a violation of the statute against usury." So equally clear and decisive on this point are the direct authorities which we have read from Stuart's Reports; Dev. Rep.; 1 Vermont Rep.; Conn. Rep.; 12 Pick. Rep.; &c.— Then we conclude that if usury has been committed, our general statute law upon the subject of interest must apply to these causes ; and what does that statute enact? Why, that where more than eight per cent. per annum is taken in ordinary trans-

actions, the interest shall be forfeited, but the principal shall be recovered; and for a bona fide loan of money 10 per cent. interest may be recovered. Revised Code, 461, 462. We repeat that nothing has been taken on these notes, and besides they were bona fide loans of money to the defendants, not to Dart; to take up the protested paper of the parties. Then if we have reserved an excess, can any more than that excess be deducted? The utmost extent that the court would go, would be the deduction of the interest in the case of the Planters' Bank, allowing that the record did not show the transaction to be a bona fide loan of money on the part of the Planters' Bank. The statute cannot touch the loan by the Bank of the United States, as the discount was at 6 per cent.

Taking either of the general grounds, then, which we have been discussing, and the result must be the same, excepting at most the interest in the Planters' Bank case, as already stated.— The court would, if they determined any portion of the interest to be illegal, separate the legal from it, and the plaintiffs would recover accordingly. And the court here would render such judgments as the court below ought to have done, on the general verdicts in favor of the plaintiffs, we conceive, or in their favor on the special verdicts; this court having all the facts before them in the record.

We will now briefly examine the third point which we proposed to discuss. And we think that the wisdom of our statute, in making the grounds, on which a new trial shall be granted or refused by the court below, examinable in this court, is fully exemplified in the causes now under consideration. Act of 1830, Rev. Stat. 314. If ever every principle, that can be brought to bear upon the doctrine of new trials, was violated, it has been done in this instance.

The jury in the first instance found verdicts for the plaintiffs for the amount they claimed, for the amount fairly due by the defendants; and still the court in causes, the decision of which rested peculiarly on the determination of the jury, set aside the verdicts. The great issue before the jury was whether the plaintiffs had *corruptly and usuriously* taken a greater rate of interest than they ought to have done, a question, according to the

[Planters' Bank *v.* Snodgrass.]

authorities rightly understood, for the exclusive consideration of the jury. Why, even in the opinion of the court in the case of the Bank of the United States *v.* Owen *et al.* so much relied upon by the opposite counsel, Judge Johnson hesitated as to the sufficiency of the pleas, because the pleas neither averred an intention to evade the statute, nor in the plaintiffs an actual knowledge of the depreciation of Kentucky money. But the court below in these causes *inferred* an intention in direct contradiction to the proofs and the general verdicts of the jury. How different is the language of the supreme court of the United States, contained in 3 Peters' Reports, 42, where the question of usury was before them, on a demurrer to evidence. "Such a contract being illegal is not to be presumed, it must be established in evidence.— The argument requires the court to infer such illegality, from circumstances, in their own nature equivocal and susceptible of different interpretations." "Even if the jury might have made such an inference from the evidence, we think it ought not to be made by the court." How very different is this doctrine from that adopted by the court below, in these causes? This doctrine is fully laid down also in the case of Hammitt *v.* Yea, 1 Bos. & Pul. 143. The opinions of each of the judges are given at length, and are most clear and satisfactory. Chief Justice Eyre says, "that whether more than £5 per cent. per annum is intentionally taken upon any contract, for such forbearance, is a mere question of fact for the consideration of the jury, and must always be collected from the whole of the transaction, as it passes between the parties. Justice Rooke proceeds further and furnishes an additional reason, equally conclusive, that being a *penal* matter, no new trial can be granted. That was a case, upon a motion for a new trial, by a defendant after a verdict against him upon his plea of usury, and after a verdict in favor of the plaintiff, the judge asks, "on a penal statute, shall we be so strict for the purpose of defeating a fair claim?" They decide not. See also 3 Wils. 59; 1 Wils. 17.

So in the case to be found in 1 Taunt. Rep. 413—17, where a judgment had been entered up, upon a warrant of an attorney, executed at the time the contract was made, and the usury clear, the court would not set aside the judgment unless the defendant

would do what was just, that is, pay the money loaned and the interest, upon the excess being deducted. And what is the ground of this decision? A principle equally recognised in courts of law and equity. That if the party, whom the law makes the sufferer for the act of usury has the advantage, and the other party has to apply to the discretion or equity of the court to be relieved from his situation, he must do what is just and equitable, what is right between man and man, before the court will interpose. 1 John. Ch. Rep. 367. This authority furnishes the rule upon this subject, sanctioned by all the decisions in the courts of equity—that a party will not be relieved from a usurious contract, but upon the terms of paying the money loaned, and legal interest.

And how much stronger is the case, in an application for a new trial, where the jury has found against the corrupt intent and in favor of justice? Why even in doubtful cases, and the evidence contradictory, the courts never *award* a new trial. And this doctrine is so strictly regarded by the courts that it is sometimes carried to an extent bordering on the ridiculous. 1 Wils. 22. 4 D. & E. 468.

And, in connection with these principles, let us not overlook the broad ground recognised by all the courts, which must be conclusive upon the subject, that where substantial justice has been done, even though there may have been some slight mistake upon the trial, some strict rules of law against the verdict, the court will not disturb it. 1 Burrow, 54. 2 D. & E. 4. 4 D. & E. 468. 1 Peters' Rep. 183. Thus in the last cited case, the Supreme Court of the United States, in reference to the doctrine of new trials, lay down the law. "That, if upon the whole case, justice has been done between the parties, and the verdict is substantially right, no new trial will be granted, although there may have been some mistakes committed at the trial. The reason is, that the application is not matter of absolute right in the party, but rests in the judgment of the court, and is to be granted only where it is in furtherance of substantial justice." It requires no comment of counsel to apply this language to the causes now before the court.

Upon all these grounds, therefore, which we have urged upon the consideration of the court, in every aspect in which the causes can be viewed, we are irresistibly brought to the conclusion that

substantial justice is in favor of the general verdicts found by the juries; that it is in furtherance of law and equity, and sound morals, that contracts like those sued on, made in good faith, should be sacredly observed; and we feel all the confidence that ever could inspire counsel in any cause, that this tribunal, of last resort to the parties, will uphold and enforce, to the fullest extent, all such contracts.

The counsel for the plaintiffs in error, in reply to the argument for the defendant, submitted the following points:

The first principle contended for by the appellees, that the intent to take interest beyond the rate authorised by the statutes, was the same thing as an intent to violate the law, or commit usury, is either not true in point of fact, or improperly applied to cases like those before the court. The principle is supposed to be deduced from the decisions in 4 Rand. 406 and 12 Pick. 586. If such a rule of law is laid down by the Supreme Court of Massachusetts and Virginia, those tribunals are, certainly, the best interpreters of their own views, and meaning on the subject. In the case of the Agricultural Bank *v.* Bissell, (12 Pick'g. 586,) where it is said the Chief Justice lays down the rule, he directly and expressly refuses to apply it to a state of facts, precisely like that under review, except in the amount of money involved in the issues. So in a case decided after great deliberation, and on a re-argument by the most distinguished counsel, the highest court in Virginia solemnly decided, that the knowledge of the parties that Rowlett's tables gave a slight excess over the statutory rate of interest, did not affect the transaction with usury, if the rule was resorted to as a matter of convenience, and not as a device and shift to evade the law: see the case of "Bank of North Carolina *v.* Cowen," in manuscript, and 9 Peters, 399. 2 Wm. Blacks. 793. It will be further noticed, that the rule contended for would not apply to the cases under review, because there was no *agreement to receive or take* any illegal rate of interest, but the whole supposed error consists in adopting a wrong rule of calculating a right rate of interest. (See the abstract.)

It was further contended by the appellees, that usage could not alter the law. It has been shown that the wisest Judges have

50*

resorted to usage as a correct means of explaining a doubtful transaction. 1 Cowper, 112.

Now there are three distinct cases, in connection with this very subject of usury, in which usage has sanctioned a much greater excess than that complained of by the appellees. We refer to the practice of taking interest in advance, and to the including of the day of payment on a renewal, in the renewed note, by which interest is taken on each renewal, for one day too much; and also to the law of usances, and half usances, by which on a note at usance or a half usance renewed without grace, if all the months were of thirty days, a loss would accrue to the borrower of five days in the year, and if all the months were of twenty-eight days, like February, a gain would accrue to the borrower of two days in a month, or twenty-four days in a year. And in these cases there is no pretext of convenience. 9 Wheat. 585. 11 Ib. 430. 3 Peters 40. 1 Stewart 442. 2 Wm. Black. 792. 8 Wheat. 345. 4 Term. R. 148. Bayly on Bills, 239, last edition.

It is also clear, that the mere taking of an excess, is a very different thing from the intentional taking. 1 B. & P. 151. 3 Ib. 159. 17 Vesey 44—7. Cro. Jac. 508. 2 Cowen 706.

Whether the charters of the Banks, in reference to the rule of interest, are to be regarded as limitations, or prohibitions, will not, at present, make any difference, as the rate of interest is not in question by the pleadings on the record, but only the mode of calculation and the penalty. Much reliance was placed upon the case in 2 Peters 536, but the authority of that case is materially affected by the subsequent decision between the same parties in 9 Peters 398. The distinction is clearly taken in the last case, between the act and intention, or the *quo animo* and the act; and the distinction is said to be all important, 9 Peters 400. This case will be again referred to hereafter.

The authorities relied on by the appellees from 2 Cowen 699, 4 Peters 169, and 5 Eng. Cond. Rep. 216, were of cases where the particular contract itself was prohibited, and not the mere accessory of interest; and even in them, a recovery was held to be proper, on the common counts, or on the securities themselves, in fa-

vor of a bona fide holder. Chitty on Bills, (last Ed.) 114. 5 Wend. 596.

In reply to the argument, that the court cannot legally regard the consequences of its decision on society at large, in these doubtful matters, and on questions of *summum jus*, we refer with confidence to the following authorities: 2 W. Blacks. 792. 4 T. R. 148. 1 Dever. 100, 121, 128. 9 Wheaton 585, and the Bank of North Carolina *v.* Cowen, in manuscript.

Having thus briefly alluded to some of the more important points offered by the appellees, we proceed to the direct examination of the case.

1. We deny that the cases are in an attitude to present the question of usury to the consideration of the court. On the first trial prior to the return of the verdict by the jury, no error of any kind was committed, no improper testimony was admitted, and no proper testimony was excluded. Neither party requested any instructions to the jury. The first error, and the only one of which we complain, was the granting of the motion for a new trial. If that was an error, we ask to have it rectified, and we think we are entitled to what we ask. We care not whether the proceedings on the second trial were correct or incorrect. They were all had by consent, and solely to get a final judgment from which we could appeal. We were willing to give a verdict on the second trial in favor of the defendants; for if the second trial, according to the rules of law, ought never to have taken place, it became wholly immaterial to us to take notice of its result. By the operation of the act of 1830, (Rev'd Laws, 314,) the case now stands before this court, in the attitude of a direct motion by the appellees for a new trial. They are in fact actors, seeking the aid of the court, against the legal advantages of a verdict; and they are not entitled to that equitable relief, until they first pay, or tender, the principal sum due, and lawful interest. We further contend, that in all penal and hard actions or defences, where there is no misdirection of the Judge, and there is evidence on both sides, no new trial has ever been granted, if the penalty has been avoided on the first trial, and this is not a matter of discretion, but a matter of law. 1 Wils. 17, 22. 2 Ib. 306. 3 Ib.

59.  1 B & P. 151.  1 Taunt. 413.  1 J. C. R. 367.  Comyn on Usury 50, 79, 81.  2 Cowen 483, 815.  9 J. R. 36.  5 Wend. 595. 3 Burrows 1308.  1 Ib. 25.  Farewell *v.* Cheffey *et al.*  1 Sellon 485, 8.  7 Bacon 784, 789.  Trial L. 8. 1 Wend. 418.  4 Ib. 229.

2.  Again, it is a well settled rule of law, that when there are two issues, and one is properly found under the evidence, the whole verdict shall stand.  7 Bac. 773; 19 J. R. 7; 5 Wend. 595; and the cases hereafter cited, where though the security is avoided, a recovery is allowed on the common counts.  By a reference to the abstracts, it will be seen, that the finding of the jury on the common counts, according to all the authorities, was proper, even if the law did declare the securities void.  All the parties to the notes, whether makers or endorsers, were *principals in the debt,* for it is expressly stated, that the note sued on was discounted to take up protested paper, *on which they were all bound.*  Then, the recovery on the common counts, was clearly correct, and the verdict cannot be disturbed.  The parties were not securities for each other, though that might be inferred from the fact, that they are not all makers of the note.  Such an inference is, however, rebutted by the express proof in the case, and the finding of the jury should not be disturbed.

3.  The jury had testimony on both sides, and conflicting testimony too, as to all the following matters, which are absolutely necessary to be considered in the cause, and which they alone could try; the corrupt agreement to discount the notes sued on; Comyn on Usury, 61, 72, 73; 9 Peters, 310–7–40; also, the connection between the entries in the Bank books of Dart, (the maker,) and the notes sued on, also the authority, or mistake of the clerk who calculated the interest, or made the entries, and whether the consideration of the notes was mutual to all parties to the notes, or whether the notes were for the accommodation of some or all of them.

4.  The whole matter whether there was an original agreement at the date of the notes and bills, in part payment of which the notes sued on were given, that such notes and bills should be renewed by the notes sued on, with the supposed illegal interest included in them; whether the agreement, if any, was corrupt;

what was its consideration; whether it was mutual; were all subjects solely for the jury to decide, and their finding cannot be properly questioned.

5. We contend affirmatively, that on the case shown by the bills of exceptions, the finding of the jury was correct, and therefore, that no new trial should have been granted. This brings up the whole case, and opens it for examination before the court. The cases under consideration differ in these points; in one, there is a demurrer to the plea of usury, on the ground, that the plea should not go to the whole action, but only in avoidance of the prohibited interest or the illegal excess. This is in fact the main question in the case, and will be covered by the arguments and authorities upon the consequences of usurious acts under our laws. In the one case, the usury laws of the state fix the rate of interest and penalty; in the other, the rate of interest is regulated by the Bank charter alone. The charter of the United States Bank is prohibitory, and that of the Planters' Bank is permissive. In one case, there was a payment of $2500, as attorneys' fees, included in the note, but not exacted or required, and voluntarily made on a compromise. 2 T. R. 52; Comyn on Usury, 45, 6, 7, 9. In other respects, they are similar. We contend then affirmatively, that there has been no violation of the Bank charter, or the usury laws of the state, in the transactions spread out upon the records. Usury is not now, if it ever was, a common law offence, and there can be no common law penalty affixed to its commission. 8 Bac. 312; Comyn's Dig. Usury A.; Comyn on Usury, 1, 61, 72, 73, 83; 1 Wils. 292, 5; 3 Ib. 255, 60, 292, 5; 2 N. H. R. 42; 2 Cowen, 732, 738, 769; 1 Stewart, 442; Cro. Eliz. 643; 9 Peters, 378, 87, 99; 2 Wm. Black. 863. In the case from 2 Peters, decided by a bare majority of the court, Judge Johnson uses an expression, which, the authorities last cited, shows, must be taken with some limitation or explanation. After stating that the contract was admitted to be corrupt by the pleadings, he adds his opinion, that such a contract was void on general principles, and it is inferred from that expression, that the court meant to say, that contracts tainted with usury, were void on general principles. This certainly is not now, if it ever was the law, nor does it appear to have been the meaning of the judge. The case before him was not a case of usury

*per se,* speaking from the face of the contract, but arose from shifts and devices to evade the prohibitions of the law.   It is very clear, from the cases cited, that there is not now any general principle which would render usurious contracts void.   All depends on the particular statutes of each particular country; and if we recur to the old common law, or canon law, when usury was regarded as an offence against human and divine laws, no general principle like that stated by Judge Johnson, can be made applicable to cases arising at the present day, for all interest, however small, subjected the usurer or money lender, to the penalty of that law.

Again; the corrupt agreement is a matter of fact, and not a matter of law, and is traversable before the jury.   Bac. Ab. Usury K. L.   2 Doug. 430, and 1 B. & P. 152, shows it is never presumed.  Comyn on Usury, 45, 90, 5, 7; 7 J. R. 283; 1 Ver. 395; 11 Conn. 495, citing 5 Conn.; 1 Vesey, jr. 533; 4 Rand. 406; 5 Leigh, 257; 4 Peters, 224.

It must be remembered, that this is not a case of usury *per se,* or where the contract on its face imports usury; for here no rate of interest is mentioned in the note.   The distinction so clearly illustrated in 9 Peters, 399 & 400, is of great importance, and we may with the utmost truth and propriety adopt the very language of the court; "here there has been no taking or reservation, &c. on the face of the contract, and the case resolves itself into this; has there been any corrupt agreement, or device or shift, to reserve or take usury, and in this aspect of the case, the *quo animo,* as well as the *act* of the parties is most important." This quo animo, is shown to be the subject of consideration for the jury, and it is not in the discretion of the court to exercise its authority upon what it may conceive to be the improper views of the jury. The principle is even broader than that stated by Judge Story ; for the rule is of universal application, that when a difficulty or doubt is raised by proof, the party against whom it is raised, is entitled to all the alleviating circumstances accompanying the proof.   It must all go together, and the jury are to draw their own inference.   Is it not clear, then, that the jury then in the present case, on the proof, came to a correct conclusion, that no corrupt agreement had been shown.   The bills of exceptions are a complete and satisfactory answer to this enquiry, and they will

further show that there never was *any* agreement, *aggregatio mentium*, between the banks or their authorized agents or officers, and the appellee, in reference to any one of the facts relied on to fix the charge of usury on the appellants. The authority of the Bank Clerk, cannot be traced to the Board, or Stockholders. Angell & Ames on Corporations, 122; 8 Wheat. 357. And if it could be, there is no pretence that the appellee, or any other party to the note, assented to, or contracted in any way, as to the rate of interest or mode of calculation. 3 Day's R. 268; Wm. Black. 863; Comyn on Usury, 8, 22. This is the material distinction between the cases before the court, and the case in 2 Peters, and 3 B. & P. 157. The whole transaction, so far as the original contract, in pursuance of which the notes in suit were given, was between the clerk, whom it is shown, had no authority, and the persons who offered the notes to the Bank, whether the defendant or some other. Still, the proceeds of the notes went to the credit of the protested paper, and whether by authority of the board or not, we have a right to recover it as money loaned, or had and received to our use, under the common counts.

Another important point arises, which according to numerous authorities, would protect us from the penalty of the usury laws. There was no proof whatever to show, that the Bank had agreed on the discount of the notes and bills, which have been settled, to renew them again by the notes sued on, reserving illegal interest. 2 Cowen, 764; 3 Peters, 42; Comyn on Usury, 71, 72; 8 Mass. 256; 3 Wend. 64; 8 Cowen, 696.

There was no reservation of any interest but at the rate of 6 per cent. in the one case, and 8 per cent. in the other, and there has been no taking of any interest whatever. The abstracts sufficiently show this point, and it would seem to be decisive of the whole case. 7 T. R. 184; 9 Peters, 398; Comyn on Usury, 86, 92. There was no intention even by the clerk, or any other person, who calculated the interest, to take any greater rate of interest, or to do any other act, than merely to *compute* the interest according to the statutory rates. It *is* not a question of the rate of interest agreed on, but merely of the rule of computation; and it seems clear, that no rule of computation, fairly and honest-

ly agreed on, can taint a transaction, otherwise good, with usury. In 2 J. C. R. 299, and 2 Paige C. R. 207, rules of computation expressly at war with the statute, have been sanctioned when there was no fraud. So in 2 Cowen, 732, where the excess did not amount to a sufficient sum to come within the general usury law. So in B. & P. 157, it appears that the calculations there furnished to the court, under its inspection, by its officers, and with its approval, were all made on the principle of Rowlett's Tables, although they are not named in the case. The computation generally made in references from chancery, exceeds the statutory rate of interest, and if the court here following out these acknowledged principles, were to refer the cases before them to a master, he would return the calculation of interest, unless otherwise ordered, just as it now is. This mere matter of computation has nothing to do with the corrupt agreement. The rate of interest may be right, and the rule of computation wrong, and the reverse, they are entirely independent of each other. Now, to apply the principle, where is there in the whole record a hint at any agreement as to the rule of calculating the interest. There is not in the case, any thing to be found, (but the contrary,) to show that any intent whatever existed in the Board of Directors, who alone could contract with the defendants, as to a single fact in the pleas. 8 Wheat. 358; 2 Cowen, 718; 15 Petersdorff, 246, 251, and note; 3 Cowen, 289, as to the intention see the cases cited on the subject of penalty. 2 Cowen, 769, 7, 739; 3 Peters, 36, 42; 8 Wheat. 355; 9 Peters, 378, 87, 99; 8 Cowen, 696; 9 Mass. 47, 9.

And the fact stated in the pleas, that the notes had been once offered at the correct rate of interest and refused by the Board, and then afterwards taken at a greater rate, is not only not sustained by proof, but is expressly negatived in the bill of exceptions. This was deemed by Judge Johnson, in 2 Peters, of sufficient importance to be the material ground of his decision.

In conclusion of this part of the argument, we offer a single additional suggestion.

The amount of the notes sued on, was what remained after a settlement and compromise between the Bank and the appellees. Now before we can say that this amount exceeded what was actually due, with lawful interest, prior to the compromise, it

becomes absolutely necessary to know how much was then due. Without this, one element of the calculation is wanting, a link in the chain of proof is lost.   It may be said, that you cannot presume any thing as to the aggregate sum of the protested notes and paper which were settled.   But it is no matter of presumption; the proof is called for on the other side to make out a defence.   We show affirmatively that the notes sued on were given to pay a balance due on a compromise of pre-existing debts, and until it is demonstrated that the amount of the notes sued on, with the interest included, added to what was paid down or settled on the compromise, exceeded the original debt and lawful interest, it cannot appear that usury has been committed.   The defendants do not make out their case unless this showing is made; and we might safely rely on this point alone to sanction all the claims of the appellants.   4 Rand. 406, is full and clear on this head.   We thus think it sufficiently appears, by connecting the foregoing authorities with the causes as they stood before the jury, that their finding could not be other than it was, should they be again before them on the same proofs.

But if the bank charters have been violated, or usury committed, what, under our laws, will be the legal consequences?   The solution must depend on the general laws, or the bank charters. The Planters' Bank charter contains no prohibition, much less any penalty.   Act of 1833, p. 126.   It is also entirely affirmative in its terms, and relates solely to the interest, and not to the contract of loan or the security.   The powers of the Directors on those points are general.   7 Bac. 448; 9 Peters, 378; 10 Mass. 289; 16 *Ib.* 124.   Now, if there be one principle in the laws upon this subject, which admits of no cavil, it is that a penalty is never implied, and that statutes inflicting penalties, or the principles of the common law which impose them, are limited, with an iron hand, to the very case and the very thing prohibited.   It has been said that a penalty implies prohibition, and it may be so, but the reverse of this proposition is not true.   Carthew, 252; 1 Taunt, 139; 14 J. Rep. 273; 2 *Ib.* 379; 2 Cowen, 699; 1 Mass. 167; 19 J. R. 7; Chitty on Bills, (last edition,) 876; 7 Bac. 463; 8 Wheat. 355; 10 *Ib.* 391, 392; 8 Mass. 256; Comyn on Usury, 72, 4, 80, 1, 5, 6, 92; 3 Wend. 569.   "A penalty cannot be raised

by implication, but must be expressly created and imposed," 2 J. R. 380. So in Rhode Island, the statutes of usury fix the lawful rate of interest at 6 per cent. and add a penalty of the loss of all the interest and one-third of the principal. " But the statute goes no further, *it does not forbid the contract of loan, nor preclude ther ecovery of the principal under any circumstances.* The sanctions of the law are the loss of the whole interest and one third of the principal sum loaned. *On what principle could this court add another to the penalties declared by the law itself?"* 10 Wheat. 392. This question, put so forcibly by the supreme court of the United States, is full of application to the cases before this court. What is the thing prohibited ? In one of the charters the rate of interest is *permitted* to be a given amount, and in the other, it is *forbidden* to be beyond a certain sum. Take it, then, that there is a prohibition, to what does it extend ? certainly neither to the contract nor security. What then is the penalty ? None is fixed in the charters, and if you resort to general principles, or the general usury laws, you cannot go beyond the forfeiture of the thing prohibited, which is the excess of interest; and this, too, would be by implication, contrary to all the authorities above cited. If you refer, to ascertain the supposed penalty, to the policy of the law, then we ask what policy have we violated ? It is a policy founded in the general statutes ; and if language can be made plain, that policy goes no further than to abate the legal interest; "how can the court add another to the penalties declared by the law itself?" The government may provide for a forfeiture, when there is no penalty provided in the charter ; but the citizen cannot set up the defence collaterally; his rights are postponed till after office found. " The taking of interest beyond the sum authorised by the charter, would doubtless be a violation of the charter, for which a remedy might be applied by the government; but as the act does not declare that it should avoid the contract, it is not perceived how the original defendant could avail himself of this ground to defeat a recovery." 8 Wheat. 355; Angell & Ames on Corporations, 510; 9 Mass. 423. Under this head, there can be no question as to the case of the U. S. Bank, now before the court. For the excess above six per cent. is not sufficient to come up to the usury

law of the state; and according to the case in 2 Cowen, so much relied on by the other side, that circumstance alone is sufficient to save the penalty of the usury laws. See 2 Cowen, 739, 767, 9. And as to the Planters' Bank case, the worst aspect in which it can be placed, would be to subject it to the state usury laws or policy, and thus avoid the interest. That Bank, in fact, on all loans, between one and two years, has no law but the general law. On such loans there never has been the slightest alteration of the general law. She is left to make her contracts, on such loans, precisely as any citizen, and as if nothing had been done by the charter, but to give the power to make such loans. The rate of interest is not altered; it is eight per cent., and how can the penalty, which is in the same general law, be altered, when nothing is said about it. Suppose the clause had read, " The said Bank shall have authority to make loans, &c., on notes having one and not more than two years to run," and had been silent as to any rate of interest or penalty whatever. What would have been the effect? Clearly the Bank as a corporation, would have been placed in the exact attitude of any individual, both as to the rate of interest and penalty. Now, the alteration by the charter, of the rate of interest, would not affect the question of the penalty; that would still remain unless expressly altered. And when it is seen that on the note in question, neither the rate of interest or penalty has been touched by the charter, how can the case be taken away from the operation of the principle of the general law, if the proof is such as to warrant the application of that law. It having been shown that usury is not a common law offence, and so that no common law penalty can attach to its commission, it follows as a necessary consequence, that no penalty exists unless given by statute, and that never can be extended beyond the statutes. 1 H. Black. 462; Chitty on Contracts, 230; Carthew, 230, 252; 5 Taunt. 727; Hobart, 14, (Ed. 1839.) and note; 1 Vesey, 305. To ascertain what is a penal statute, See Cone *v.* Bowles, Salk. 205; and Rex *v.* Inhabitants of Glastonry, Rep. Temp. Hardwicke, 357.

It has been supposed that there is a distinction between things declared void by common law, and such as are avoided by statutes. But when the authorities are carefully examined, the dis-

tinction is found not to exist. The subject is treated with great power in 10 Peters, 358, 360, 361. The error has crept into all the elementary treatises, and may be traced to a mis-quotation of a case, made from memory, of what was said by Hobart, as above cited. Hobart is reported to have declared that "the common law was like a nursing father, saving what was good, and destroying only the bad, but where a statute comes it makes all void." If the language had been used, it would not be authority, as Hobart is a loose and unsafe reporter. See the opinion of Hardwicke in 1 Vesey, 305. But the case referred to, shows no such a dictum. The question arose on a bond given to a sheriff, which it was contended, might be sustained as a common law bond, though against the provisions of the statutes on the subject. The Judge remarked, in substance, that even if it would have been good at common law, that could not help the case, for where the statute in question came it made all void; confining his remarks to the particular case and the particular bond. The truth is, and so it will appear from the cases referred to, that whatever is avoided either by common law or statute, cannot be enforced; but both endeavor to sever the good from the bad; and when this can be done, the forfeiture and penalty are always confined to the very terms of the law or policy. And this is the only general sense, in which the dictum of Judge Johnson, in 2 Peters, can be sustained throughout. He refers to this very case from Hobart, and all the cases cited by him were of things which were in the whole declared void by the express provision of law. Do the general principles apply to corporations. The authorities are clear, that they are bound by general laws. 15 J. R. 381; 2 J. R. 379; 9 Mass. 52; 3 Peters, 42; 2 Cowen, 378, 763, 7; 9 Peters, 398.

The deduction is always to be made, and the security and contract not avoided if they can be saved. Angell & Ames on Corporations, 142 to 145; 4 Wheat. 225; 1 Blackford, 367; 1 Stewart, 468; 8 Wheat. 355; Chitty on Bills, (last Ed.) 876; 4 Wend. 654; Bayly on Bills, 574, 366; 7 Wend. 569.

"The lending of the money is not declared to be void, and therefore when money has been lent, it may be recovered, although the security itself is void." 19 J. R. 7. A fortiori could it be recovered where neither the contract nor security are declared void.

[Planters' Bank *v.* Snodgrass.]

The whole scope and tendency of modern decisions on this very subject of usury, has been to relax the rigor of the ancient and unreasonable prejudices entertained against the Jewish money lender and transferred from him to the whole creditor class of the community. Formerly, the usurer was regarded with a horror hardly to be appeased by the severest inflictions of the laws. He was declared unworthy of Christian burial, a violator of the divine law, and ranked with felons of the worst dye. The fulminations of the church and the terrors of the civil authorities were showered upon him with unsparing severity. Usury, in those days, meant money lending, whether for great or little gains. How different is the view of modern Judges and lawgivers. In England, the usury laws (except as to the great monied corporation of the kingdom) have been all repealed within the last year. In New York, where the decision in 2 Cowen was made by the Senate as a court of appeals, immediately after the result was known, the same Senate, in connection with the House of Representatives, passed a declaratory law, setting the subject at rest, and declaring 30 days to be a month for all the purposes of fiscal calculation. In every other state in the Union, where a similar question has arisen, it has been decided on the very grounds for which we contend. In the District Court of Louisiana, the same adjudication has been made. In Maryland and Connecticut, statutes, similar to that in New York, and expressly declaratory of what the Judges had already decided, have been passed, and Congress has made a similar provision for the Banks in the District of Columbia, and has also expressed its opinion of what the law is, independent of statutes, by adopting a report of a committee to the effect, that there is nothing culpable in the practice contended for by the appellants. Still further back, a strong tendency to save a transaction from the animadversions of the usury laws, was exhibited. A striking illustration is found in 7 Bacon, 211, title usury, K. Are we not then warranted in saying that the case is not clear against us, even if the court think it is not clear in our favor. And must not the court under such circumstances in balancing its judgment, look to the consequences connected with the different rules contended for? Or are precedent and authority to weigh for nothing? We think it a matter of some consequence,

51*

that there is not a State in the Union, so far as their records show, where the decision sought by the appellees could now be made; and there never has been but one such decision since the United States became a nation.   And in a matter of doubtful policy, no avoidance ever takes place.   Chitty on Cont. 277.

The rule maintained by the appellees would affix the greater penalty to the less offence, and the smaller penalty to the greater offence, for the loss of interest is the utmost that could accrue, if 10 per cent interest had been received or taken; the penalty would also be greater, when not provided for at all, than when named expressly in the statute and provided for in terms.

We therefore conclude, as we are not directly, by prohibition or otherwise, subjected to any penalty in the charter of the United States Bank, as we are not in the Planters' Bank charter forbidden to contract for loans and discounts, and are left as to all notes between one and two years, as if no laws but our usury law existed, the utmost that can be done, is to deny us the interest, concerning which, according to the views of the appellees, we are not permitted to contract.   As our securities are no where avoided or forbidden to us, we shall be left to hold them, severing from them whatever interest may be improperly included in them, if any such exist.   This is the most unfavorable view of the cases.   We believe, however, that the verdicts should stand as they are, that the proper rate of interest has not been exceeded by any agreement between the parties, and that the rule of calculation by Rowlett's Tables, gives greater general certainty than any other, in the certain assurance that no greater error or excess can be committed by their use, than "the twentieth part of one poor scruple,"—an excess "unworthy the consideration of the borrower, the lender or the court," and which constitutes no profit to the one or loss to the other.   The principle "de minimis non curat lex," covers the whole ground of the defence, and if any thing could add strength to its application, it is the consideration, that the banks use the tables against themselves as well as for themselves, in paying their debts as well as exacting their dues.   So that the profit and loss, in the long run, would not differ materially from each other.

Referring again to the direct authorities to be found in 1 Stew-

art, 467.  1 Devereux 100.  5 Connecticut 567.  11 Ib. 495.  1 Vermont 399, 430.  12 Pick. 586.  Agricultural Bank *v.* Bissell, and the manuscript cases from Louisiana and Virginia, and asking for them a careful examination, we are satisfied to leave the interest of our clients to the solemn deliberation and judgment of the Court.

Hughes on the same side.

Prentiss, for defendant in error.

Three errors are assigned:—

1st.  Overruling plaintiff's demurrer to defendant's second plea.

2d.  Granting new trial.

3d.  Giving judgment for defendant in the special verdict.

The last assignment is the only one of importance, and I shall proceed to consider it at once, giving to the other two a passing notice in conclusion.  The following are the important facts found by the jury in the special verdict:

1.  That the Planters' Bank had commenced divers suits against C. Dart, defendant, and others, upon certain promissory notes, bills of exchange, &c. which suits were compromised by the parties, and the note now in controversy, was *discounted by the Planters' Bank* for the purpose of appropriating the proceeds thereof to the payment of said notes and bills of exchange.

That the officers of the Bank, in calculating the discount upon said note, reserved it for the whole time the note had to run, and also calculated it by Rowlett's Tables, allowing 360 days only to the year, whereby they retained a fraction more than legal interest.

That the nett proceeds of said note so discounted, were passed to the credit of C. Dart, and then appropriated to the payment of said protested paper.

That the mode above stated of calculating interest, *was the uniform mode* of calculating interest in the Planters' Bank; but was *adopted* for convenience, and not with a design to violate the usury laws or the charter.

That the directors of the Bank knew nothing of the mode of calculating interest, adopted in the Bank; but *the officers of the*

*Bank knew* that the mode *pursued by the Bank*, would give more interest than the usual mode of calculating the year correctly.

That there was no agreement *specifically* made, and nothing *said* about interest ; but the calculation was made *according to the customs of the Bank* and *settlement accordingly.*

Such are all the material facts found by the jury and embraced in their special verdict.

Upon this state of facts I shall proceed to enquire :

1st. Whether the note sued on was not acquired by the plaintiffs upon a usurious consideration ?

2d. Whether it was not discounted in violation of the charter of said Bank?

3d. What is the effect of a violation of the usury law, upon the contract?

4th. What the effect of discounting the note upon terms prohibited by the charter ?

First.—I contend that the Bank was guilty of usury, and violated the general law upon that subject.

To constitute usury, there must be "a corrupt agreement on the part of the lender to receive, and on the part of the borrower to give, more than the legal rate of interest" for forbearance on a loan of money.

The lender in this case was the Planters' Bank, a corporation, which of course could make an agreement or act only through its agents and officers.

Through those agents and officers it discounted the note in question, and reserved *knowingly* more than 8 per cent. per annum. The money loaned was carried to the credit of the borrower, who assented to the reservation by accepting and appropriating the proceeds of the discount.

But it is said that the jury have found in their special verdict, that there was no *agreement specifically made* on the subject of interest. That is true ; but the jury have also found facts, which of themselves constitute an *agreement*—a perfect " *aggregatio mentium,*" to find which, seems so much to puzzle the plaintiff's counsel. It does not appear, indeed, that a word ever passed between the parties, from the time the note was offered for dis-

count.  The acts of the parties, however, prove the agreement. The note is offered for discount.  *The usage of the Bank*, is to reserve 8 per cent. for 360 days.  The directors say it shall be discounted; another set of officers and agents of the Bank, according to the uniform usage of the Bank, reserve for interest more than 8 per cent. per annum; and the loan or agreement is consummated by passing the amount loaned to the credit of the borrower.  The borrower accepts and uses the money.  The Bank ratifies the agreement, so consummated, by holding the note, and she now sues upon it.

Surely by this very suit she is estopped from denying that the acts of her agents, by which she acquired all her right to the note, are binding upon her.

The acts of those officers of the Bank, whose duty it was to calculate the discount, pay over the money loaned, or pass it to the credit of the borrower, were as much the acts of the Bank, as the resolution of the directors on the subject.  The action of all these agents was necessary to the consummation of the agreement. The corporation is responsible for the rules and principles upon which its officers profess to act.  If it were otherwise, a corporation could not be guilty of usury in violation of law at all, inasmuch as it can only act through agents and officers.

That the acts of its officers are binding upon a corporation, *vide*, Angell & Ames on Corp. 154, 157, 158; 7 Cranch, 299.

A Corporation is liable for wrongful acts, and neglects of servants and agents.  Angell & Ames on Corp. 174, &c.  See also as to this point, Stribbling *v.* Bank of the Valley, 5 Randolph, 142.

I think it cannot be questioned, then, that the acts of its officers, in calculating the interest, and reserving the same upon the note offered for discount, according to the uniform custom of the Bank, were the acts of the Bank itself; in other words, the Planters' Bank, the plaintiff in this suit, did calculate interest by Rowlett's Tables, and did reserve at the rate of 8 per cent. for 360 days.

The officers knew the fact, that this was more than 8 per cent. per annum.  Such knowledge was in law, the knowledge of the Bank.

The officers did not design to violate, either the usury laws, or their charter, it is said, but adopted the mode of calculating the year at 360 days, merely for convenience.  I will give the Bank the benefit of this want of design on the part of the officers, and hope to show to the satisfaction of the court, that where there is an actual taking, a reservation of more than legal interest, not by mistake, but knowingly, it is usury, even though it appear that the parties did not intend to violate the statute.

His Honor, Judge Trotter, in his opinion given upon the first argument, has laid it down that to constitute the offence of usury " there must be an agreement between the lender and borrower of money, by which the latter knowingly gives or promises, and the former knowingly takes or reserves, a higher rate of interest than the statute allows, *and with an intention to violate the statute.*" Now under favor, I conceive this latter branch of his Honor's definition wholly untenable, at least in cases where the question arises in an action upon contract.  I shall not examine how far it is applicable to penal actions, and criminal prosecutions.

I will show by the most irrefragable authorities, that a contract may be usurious, where the parties had not only no intention to violate the law, but did not even know what the law was.

The true rule is this, in regard to intention.  The parties must have intended what they did, that is their own acts.  If they *intended* to do what they did, and their acts are in violation of the statute, it is usury, even though there was not the slightest design to violate the law.

It would be otherwise, where there was ignorance of facts, such as an error in calculation, a mistake in addition, &c.  But where there is a knowledge of the facts, and only an ignorance of the law, the contract will not be protected.  "*Ignorantia legis neminem excusat.*"  See 5 Moore, 571, 588.

The case of Marsh *v.* Martindale, 3 Bos. & Pull. 154, is full as to this point.  In that case, the jury expressly found that Marsh, the plaintiff, *did not think he was acting contrary to law*, thereby positively negativing any *intention* to violate the statute. Yet the chief justice says, "there is nothing in that finding to prevent us from examining the transaction and declaring it to be

corrupt, if it appear to be so *in point of law*, without sending the case back to a jury to find the corruption." See 17 Vesey, 47, Barnard *v.* Young.

In the case of the New York Fire Ins. Co. *v.* Ely & Parsons, 2 Cowen's Rep. 678, the same principle is fully recognized.

It was decided in that case, that "the adoption of an erroneous principle of calculation, which gives more than legal interest, and receiving the discount or interest according to that principle, is usury, *though the lender believes that he has a legal right to do so.*"

In addition to the above cases, I will cite Gibson *v.* Fristoe *et al.* 1 Call's Rep. 63, which is directly in point. The jury rendered a special verdict, in which they stated the facts of the contract, but did not *find the intent.* The court say, " If the corrupt agreement be not expressed in the verdict, *but it is apparent to the court* that the matter is usury, then it is not necessary for the jury to show that it was corruptly made."

In the case of Childers *v.* Deane *et al.* 4 Randolph's Rep. 406-11, Judge Carr says, " To constitute usury there must be an *intention* to take more than legal interest. Wherever such *intention* appears, in the taking more than legal interest, it is evidence of the corrupt agreement required by the statute; *though the party may never have heard of the law, or may think that he is steering quite clear of it.*"

In this case the court also say, (page 112,) " If a mode of calculating interest, which gives the creditor more than legal interest, is adopted, and the creditor knows it will have that effect, he is guilty of usury, *although he may not suspect that he is violating the law.*"

To the same point and to the power of the court, to declare a contract usurious, upon a special verdict, finding the facts, but not the *corrupt intent*, see, in addition to the authorities above quoted, Cro. Jac. 508; 5 Randolph, 145, 161; Mason *v.* Alidy, 3 Salk. 390; 3 Common Law Rep. 92; 9 Peters, 399.

If the law be as laid down in the foregoing authorities, I think the question of *intention*, is settled. If the facts found by the jury in their special verdict show, that the lender *knowingly*, (by which I mean, not by mistake,) took or reserved more than legal

interest, in discount, the *law* fixes the intent, and the court is bound to pronounce it usury, even, as the cases say, though the lender never heard of the law, nor designed in the slightest degree to violate it. The special verdict presents the case precisely in the same attitude, as if all the facts found, appeared upon the original contract. The court applies the law to the special verdict in this case, as it would to a written instrument, upon the face of which the facts, relied on to establish usury, appeared.

Let us now examine the special verdict, and see if more than legal interest was knowingly taken or reserved.

The jury have found that the officers of the Bank reserved the discount upon the note sued on, at the rate of eight per cent. for 360 days, *knowing that*. the mode of calculation, adopted by them, to wit, Rowlett's tables, gave more than eight per cent. per annum. It is further found by the jury, that it was the uniform custom of the Planters' Bank to take and reserve interest and discount by this rule.

Was the reservation of 8 per cent. for 360 days, usurious? Upon its face it is certainly a reservation of more than 8 per cent. per annum. It has been expressly decided in New York, that this mode of computing interest is usurious, though the party taking it had no intention of violating the statute. See case above cited, 2 Cowen, 678; also 4 Randolph, 406, where it is expressly decided that a mode of calculating which gives more than legal interest is knowingly adopted, the creditor is guilty of usury.

It is true, that in calculating interest or discount, upon the fractions of a year, it is not necessary to notice fractions of a day, &c. the doctrine of *cy. pres.* applying in such cases, but the very reasoning of the books which establishes this principle shows, that it cannot be applicable to a calculation for a year's interest or discount. See 12 Pickering, 586. The President &c. of the Agricultural Bank *v.* Bissell *et al.* In this case, though the Court decided that portions of a year might be computed, so as to avoid fractions of days, &c. yet they say, "if done in pursuance of a *principle of computation* which would give more than the legal rate, we are not prepared to say that it would not be usurious, however small the excess over the legal rate."

Now, in the case before the court, the jury have found that the

[Planters' Bank *v.* Snodgrass.]

Planters' Bank, by its officers, had adopted a principle of computation, which gave more than the legal rate, knowing that it would do so.

But it is said that this mode of computation has become sanctioned by *usage*, and stands upon the same footing with the usage of taking the discount in advance, which is acknowledged to be no violation of the usury laws.

Now, I say in answer to this, first, that *usage* upon general principles, cannot prevail against express statute, and it will be found on examination of the authorities, that taking the discount in advance is justified upon a principle totally inapplicable to the usage set up by the Bank.   That principle is, that the excess over legal interest which results from reserving the discount in advance, is not taken *as interest*, but as a compensation for the labor and trouble incident to the business of bankers.   The courts have never dared place it on the ground that usage can authorise a violation of the statute.

For the correctness of this position, I refer to Marsh *v.* Martindal, 3 Bos. & Pull. 154.   Comyn on Usury, 82 et infra.   In Floyer *v.* Edwards, Cowp. 112, Lord Mansfield says: "usage certainly will not protect usury."

2d.   But suppose, for the sake of argument, *usage* would *justify* the mode of computation adopted by the Planters' Bank.   I say the special verdict *shows no such usage*.

A usage or custom must be general, before it can claim the protection of the law.

The verdict does not find that it was the custom of other Banks or bankers to compute interest at 360 days to the year, but only that it was the usage of the Planters' Bank.   Can a single person, whether natural or artificial, continue for a long period to violate an express statute, and then set up such continual violation as a *usage*, sufficient to avoid the law?

The jury has not found that it was a usage of trade, or of any one but the Planters' Bank.   It will be admitted that the first discount made by the Planters' Bank, could not have been protected under this plea of usage.

It is preposterous and in violation of all principle to say, that

the plaintiff could legally establish a usage in violation of the general statutes, and of its own charter.

It is clear to my mind that the plaintiff was guilty of usury, in discounting the note sued on.

I now proceed to the second point, viz : did the Bank exceed her power or violate her charter, according to the facts set forth in the special verdict?

By the 22d section of the original charter, (see Laws of 1830,) the Bank is prohibited from discounting notes not made payable and negotiable at said Bank or one of its branches, "*nor shall it be lawful* for said Bank *to demand or receive* a higher rate of interest on any note made payable at said Bank than 7 per cent. per annum."

By the 1st section of an act amending said charter, approved March 2d, 1833, it is enacted "that the President, Directors and Company of the Planters' Bank, *shall have power to make discounts at the following rates,* to wit : on notes, bills, or bonds, having no more than 12 months to run, at the rate of 7 per cent. per annum; on such having more than 12 months to run, and not exceeding 24 months to run, at the rate of 8 per cent. per annum; and may also at their discretion, engage to make loans renewable for one, two, or more years at the rate of 9 per cent. per annum; provided, that on such loans, the discount shall be taken in advance for no longer period than 12 months ; and provided, also, that the directors may require at each renewal, additional security, should the same be deemed necessary or expedient."

Now, by the original charter, the Bank is expressly prohibited from taking more than 7 per cent. per annum. The discount of the note in this case, it will be acknowledged, would have been a clear violation of this prohibition. But the amendment just quoted, enlarges the power of the Bank, and empowers it to discount notes, bills, or bonds, having more than 12 months, and less than 24 to run, at the rate of 8 per cent. per annum.

It is a clear principle of law, to which I shall have occasion hereafter again to advert, that a corporation derives all its powers from its charter. *The charter is the law of its existence.* It differs in this respect from a natural person. A natural person

can do any thing *not prohibited* by law.   A corporation can ·do nothing except what is *expressly authorised by law, or necessary to carry its express powers* into execution.   Angel & Ames on Corporations, 59, 60, 139.   3 B. & A. 1.   5 Taunt. 792.   4 Peters, 158; case of Realtz *v.* Lessee of Kremlen.   Utica Ins. Co. *v.* Scott, 19 John. 1.   2 Cowen, 678.   4 Wheaton, 518.   2 Cranch, 127.   2 Peters, 538.   15 John's. 383.

But this case stands upon stronger ground than the general principle just cited.

Where the charter of a corporation prescribes the mode in which a power shall be executed, or the extent to which it shall be carried, it is equivalent to a prohibition of the exercise of that power in a different mode, or to a greater extent.

This is a clear and acknowledged principle.

I say, then, that the provision in the amendatory act of 1833, empowering the Bank to make *discount on notes*, &c. having not less than 12, nor more than 24 months to run, at the rate of 8 per cent. per annum, is equivalent to an express prohibition of discounts at a greater rate than 8 per cent. per annum.   *Expressio unius, exclusio est alterius.*

The court will remark, for it will be important hereafter in considering the effect of this violation of the charter, that the amendatory provision goes to the very act of *making the discount,* and so far as it is to be construed as prohibiting discounts at a higher rate than 8 per cent. affects not merely the excess of reservation but the whole transaction.

The previous portion of the argument on the question of usury, has, I think, demonstrated, if so plain a mathematical proposition, needed demonstration, that making a discount for 18 months, at the rate of 8 per cent. for 360 days, is making a discount at a higher rate than 8 per cent. per annum.   And whatever may be the effect of usage of trade, or custom, upon the general question of usury—it surely will not be contended, that a corporation can set up its own individual usage, against, and in violation of, an express provision of its own charter.

I take it then to be perfectly clear, that the Planters' Bank, in discounting the note in controversy, did make a discount at a higher rate than 8 per cent. per annum, and in so doing, did ex-

ceed her powers, and knowingly violated the 1st section of the amendment to her charter above quoted.

Let us now examine the effect, 1st of a violation of the usury law ; 2d of the charter.

Though in England and most of the States the statutes against usury, declare the contracts infected with it, void, yet it is clear that at common law, usury vitiated any special contract.

So far as our statutes against usury do not confine the contract for the amount originally loaned, and avoid only the interest, they are clearly inapplicable to banking corporations.

Indeed the general statutes in regard to ordinary interest, at 8 per cent. upon loans of money, do not say that the principal shall be recovered.

Neither of the two classes of cases, in which the principal is recoverable under the statute, embraces the present case.

What is the effect of exceeding the powers of the charter and violating its provisions ?

It seems to me clear from the authorities above cited, as to the extent of the powers of a corporation, that a special contract, either in violation of, or beyond the charter, cannot be enforced.

The contract in this case was not authorised *expressly* by the charter, nor was it necessary to carry any of the granted powers into effect. If it be not granted directly, or indirectly, it does not exist.

Such a contract has been declared void by the solemn decision of the Supreme Court of the United States. Bank of the United States *v.* Owen, 2 Peters, 538. Angel & Ames on Corp. 6, 139. 19 John. 1. 15 John. 358. 2 Cowen, 678. 5 Cowen, 560. 8 Cowen, 20. 3 B. & A. 1. 5 Taunt. 792.

As to the power of court below in granting new trial, see 5 Randolph, 147, 158, 163.


Montgomery, on the same side.


What is usury? See our Statute, Rev. Code, 460.

The substance of the transaction must be a contract for a greater rate of interest than permitted by statute, and no matter by what device or contrivance it is sought to conceal the real nature

[Planters' Bank *v.* Snodgrass.]

of the contract, it will be deemed usurious if the real object be to secure a greater rate of interest for the loan of money, on giving day of payment, than the law permits.

When the contract is for the bona fide sale of goods on a short credit, to bear interest at a greater rate than allowed, after maturity if not paid, it is not usurious in its inception, Cowper, 114, 115; but the plaintiff is not entitled to the excessive interest under our statute, Revised Code, 461. So when a small sum in addition to interest, is allowed for compensation for trouble in remitting money, &c. it is not usurious. This authority cannot sustain the claim of the Bank to demand attorneys' commissions, because they are allowed many valuable privileges as compensation for the various expenses they may be obliged to incur in the management of their business.

It is usury to calculate interest upon the principle that 360 days are a year, and that the several divisions are after the same proportions. 2 Cowen, 703; 9 Mass. R. 53; 1 Wend. 555; 2 Cowen, 763, contra; 12 Pickering, 588, recognizes the true principle, but takes the case out of it. (This principle is taught by Rowlett's Table, and by him called Bank interest.)

To constitute usury, there must be a corrupt agreement. Taking usurious interest is *prima facia* evidence of a usurious contract, and the presumption must be rebutted. 9 Mass. 55; 1 Saunders R. 295; 1 Wend. R. 557; 2 Cowen, 769; 5 Leigh Rep. 264, 267.

The note in Saunders runs the parallel between a defence of a contract for *usury,* and a prosecution for the penalty.

Custom among banks or others, cannot exempt them from the consequences of usury. A statute cannot be abrogated by the custom of a trade. 2 Cowen, 707; 16 John. R. 374; Cowper, 115; 2 Cowen, 763—769.

Nor is it any evidence to rebut the legal presumption of a corrupt agreement. The intent of the parties is a legal inference from established facts. Cro. Jac. 508.

It is not necessary that a special verdict should find that there was a corrupt agreement. 2 Cowen, 706; 9 Mass. 55. The court will look into the whole case, and pronounce such opinion as from the nature of the transaction they are warranted in doing. Indeed, an express finding of the jury that the party did not intend to

52*

violate the statute against usury, will not save the case.  4 Rand. Rep. 406; 17 Vesey, 47; 3 Bos. & Pul. 159.

An endorser may make the defence, especially if he endorsed for the accommodation of the maker, and although a special plea of usury in assumpsit be pleaded which is defective, or not supported by the proof, the defence may still be made under the general issue.  3 Cranch, 180; 2 McCord, 172, 178.

But under our statute of interest, it only operates a forfeiture of interest, and not of principal, to take more than the rate of interest prescribed.  Revised Code, 461.  And the Banks in most of these cases having taken less than 8 per cent. are not guilty of a violation of the statute.

We admit that we gain nothing under the statute of interest. See Charter of United States Bank, article 9, section 6; Collection of Statutes, 245, 362, 438; Statutes 1830, p. 245, section 17.  But contend that the Bank of the United States not only has no power to contract for a greater rate of interest than 6 per cent., but is prohibited from taking more.  And the Planters' Bank is also prohibited, in the original charter, from taking more than 7 per cent.  And the amendment which permits it to take 7 and 8 per cent., according to the time a note has to run, cannot justify them in taking more.  Statutes 1831, p. 362, section 3; 1833, p. 438, section 1.

A contract to loan money at interest by a bank would be void, if the power were not granted; and of course a contract for more interest than allowed is void.  15 J. R. 383; 2 Cowen, 699, 709; 3 B. & A. 9, 12; 1 Kyd on Contr. 13, 70; 4 Peters' R. 168.

The ground that we take is that the Banks have contracted in violation of the charter, although the charters of the Banks do not declare the contracts void for exceeding the powers conferred, such contracts are void on general principles.  Courts will not enforce contracts into which the law forbids parties to enter.  2 Peters' Rep. 536; 1 Howard's Rep. 150.

If usurious interest be reserved, the contract is void; but if it be not reserved, but taken afterwards, the party is liable to the penalty.  See same case, 9 Peters' R. 399.  Denies the position in 2 Peters, that reserving implied in word taking, but said it was not called for because alleged that interest was deducted.

The preface to Rowlett's Tables, (pages 3, 4, 5, 11, and 12,) refutes the position contended for, that the mode of calculation adopted by the Bank was for mere convenience, as that gives the rules for calculating by the legal subdivision of time, and points out the difference with cautious precision; and admonishes the reader of the legal decisions which had been made against the mode of calculating interest by 360 days to the year.

The mode of calculating interest according to statute, (of 365 days to the year,) being equally facile and correct, the Banks were not excusable in having adopted the method which gave them greater gain than the law allows. And if they are justified by legal decisions in departing in this small particular, where are we to set bounds beyond which they shall not go? The charter has set the boundary. The court is called on to say that a slight excess obtained by a rule adopted for convenience, (notwithstanding equally convenient rules would give the true result,) may be lawfully taken, and who shall say what slight *excess* is too large to come within the equity of this expansive principle.

In the case of Planters' Bank *v.* Snodgrass, the plaintiffs reserved 18 months' interest in advance, which is a palpable violation of their charter, which only allows them to take one year's interest in advance. See Collection of Statutes, 438—51. The parties are liable for the pre-existing debt, although the contract is void for usury. 5 Cowen's Reports, 596. Where a part of the consideration is illegal, the whole contract is void. Chitty on Bills, 114; Comyn on Usury, 168; 3 Law Library, 64.

We admit that the prior legal debt was not affected by the usurious agreement in discounting the note; but contend there is no evidence or finding as to the amount of that previous debt properly chargeable to Snodgrass; nor is there any count in the declaration on it, under which the jury could have found the amount. The vague and indefinite declaration that the plaintiffs had, previously to the date of the note sued on, commenced several suits against C. Dart, the defendant, and one of the other drawers of bills of exchange and promissory notes, is too indefinite to justify the judgment against Snodgrass for the whole amount, as he may not have been a party, in any attitude, on all or even more than one of the bills and notes mentioned. And

the plaintiffs' remedy on those notes and bills is as perfect and unimpaired now as it ever was, and they can sue on them when their right to recover can be rendered definite.

Mr. Justice TROTTER delivered the opinion of the court.

Several questions have been presented for the determination of this court, by the record in this case. The first is, whether the contract which is the subject of the action is usurious, and I shall proceed to the examination of that inquiry, in the first place. The others are dependent on that, and need not be considered until that is disposed of. This cause, and the others which are connected with it, were examined and argued with much zeal and ability by the counsel of both parties, who accompanied their arguments with a critical review of the various and numerous cases which have been decided on questions of usury. By the aids thus afforded to the court, I have been enabled the more readily to arrive at what I trust will be regarded a satisfactory conclusion. In the process of examination, by which I have formed my opinion, I have looked solely to the law; and have disregarded all extraneous considerations either of the necessity or policy of a decision either way. With any other question than what is the settled rule in reference to the subject before me, I have no concern. And I shall always esteem myself fortunate, if I shall be able to make my mind master of the law as it is written, or has been declared by authoritative judicial precedent, and make a just application of its principles to the case submitted for my decision. I shall in all cases congratulate myself, if I can succeed in doing this, without troubling myself in hunting after or indulging in speculations which belong to the other and co-ordinate departments of the government. My province is to ascertain what the law is, and not what it should be. And it shall ever be my study to do this, by a different and more enduring standard, than the power of one party and the weakness of the other, or the equally fluctuating and uncertain criterion of comparative, actual, or imputed criminality of the one or innocence of the other. These questions and others of a similar character, can never have any just influence, and will always be discarded by the judge who feels it to be his duty to go no further in any case submitted for

his investigation, than to inquire whether on the body of the evidence there is found the feature which receives or rejects the application of some general principle of law.

Having made these preliminary remarks, deemed not to be unsuited to the occasion, I shall at once dispose of the question before me.   In order to constitute the offence of usury, there must be an agreement between the lender and the borrower of money, by which the latter knowingly gives or promises, and the former . knowingly takes or reserves, a higher rate of interest than the statute allows, and with an intention to violate the statute.   There must be an agreement, and this is in all questions of usury the first thing to be considered.   Does the special verdict find any agreement between the parties in this suit, as to the rate of interest?   It does not, but finds expressly that nothing was said by them on that subject.   Is this necessary?   It would seem essentially so, from the very character of the offence.   All the cases proceed upon that ground.   In the case of Smith *v.* Beach, 3 Day's Cases, 26, more than lawful interest was reserved by the lender, without the knowledge of the borrower, and it was held that the transaction was not usurious.   "A corrupt agreement" say the court, "is essential to constitute usury, and to form a corrupt agreement, as in all other contracts, the minds of the parties must meet.   The assent of Beach, the borrower, was therefore as essential to the existence of an usurious agreement, as that of Bird."   In Price *et al. v.* Campbell, 2 Call's Rep. 123, the court in Virginia assert the same doctrine.   After commenting upon the other circumstances of the transaction, they say, "although Braxton states, that it was the intention of Campbell to take usury, he does not say that he *assented,* which is necessary to form the contract."

Our statute against usury is penal, since it inflicts a loss of the entire interest, legal as well as usurious, upon the lender. And it is not the less a penal law because it does not provide for the whole debt, or visit the offenders with fine and imprisonment.

The first section of the act of 1822, which regulates the rate of interest, enacts, that if it shall be ascertained upon the plea or answer of the defendant in any suit, that more than eight per

cent. be taken or reserved in or by any *such contract. &c.* no interest or premium whatever shall be allowed or recovered; but the principal sum only may be recovered. The second section allows ten per cent. on contracts for a bona fide loan of money, and annexes the like penalty for taking more. If this statute had made a usurious contract the subject of a penal prosecution, and the present proceeding were on that branch of the act, it is difficult to conceive how, under the proof before the court, either party to this transaction would be liable to a conviction. The defendant, however, has insisted upon a consequence of the alleged violation of this law, which is in its nature equally penal; that is, a forfeiture of the whole debt. And yet I apprehend the rule of construction is the same in the latter as it would be in the former case.

In the case of Hammet *v.* Yea, 1 Bos. & Puller, 144, which is one of the leading cases on the subject of usurious contracts, the action was defended on the ground of usury, and the judges held that the transaction was entitled to as favorable a construction as if it had been the subject of a proceeding on the other branch of the statute.

I conclude, then, that it is impossible to resolve a transaction into the form of a corrupt agreement, when the proof is that there was *no agreement at all.* But it has been argued, that the taking or reserving of more interest on this loan than the law allows, though done by the clerk of the Bank, is a violation of the law by the Bank, and is therefore, as to the Bank, as much the subject of legal animadversion as if there had been an express contract between the Bank and the defendant. *In order,* then, to respond fully to the question which has been raised in the argument, I will proceed to its investigation upon the position that it is in the same condition, so far as regards the plaintiffs, as if an express agreement had been made. It then remains to be seen whether this agreement was corruptly made, or, in other words, was entered into with a full knowledge of the excess which would result, and with an intention to violate the law.— It is the intent, in all cases of this sort, which constitutes the offence, or renders the contract corrupt. But this intent is a question, which in this, as in all cases where the intent is material,

must be ascertained by a jury, upon a full view of all the circumstances of the transaction. This is the doctrine which is sanctioned in all the books. 2 Wm. Blac. Rep. 865; 1 Vesey, Jr. 533; 1 Bos. & Puller, 151; 9 Peters' Rep. 400.

In the case of the Bank of the United States *v.* Waggoner *et al.* 9 Peters, 400, the supreme court of the United States held, that to constitute usury, there must be an intention knowingly to contract for, or take more than lawful interest. For, if neither party intend it, but act bona fide and innocently, the law will not infer a corrupt agreement. When, indeed, the contract upon its face imports usury, as by an express reservation of more than the legal rate of interest, there is no room for presumption. The intent is apparent. *Res ipsa loquitur.* But when the contract, on its face, is for legal interest only, then it must be proved, that there was some *corrupt agreement*, and that it was in the full contemplation of the parties. That case, as well as the others referred to, lays down the rule, that the *quo animo*, the contract was made, as well as the acts of the parties, becomes an important inquiry; and that this inquiry belongs to a jury. This determination of the Supreme Court of the United States is in exact accordance with the principle of the earlier cases in England, of Bolton *v.* Downham, Cro. Eliz. 642; Bedingfield *v.* Ashley, ib. 741; Roberts *v.* Tremayne, Cro. Jac. 507; and the more modern decisions in Murray *v.* Harding, 2 W. Black. 859; Floyer *v.* Edwards, 2 Cowp. 112; Hammet *v.* Yea, 1 Bos. & Pul. 144; Doe *v.* Gooch, 3 Barn. & Ald. 664, and Salorette *v.* Melville, 7 Barn. &. Cres. 431. The same doctrine was held in the case of the Bank *v.* Owen, 2 Peters' Rep. 536. To the special plea, alleging a *corrupt agreement* in that case, the plaintiff demurred. Judge Johnson, who delivered the opinion of the court, observed that he had great difficulty, because the plea did not aver an intent to violate or evade the law, but he was content to unite with the three other judges, who made the majority on that point. And he gives as a reason for this, that the demurrer, implied a confession of the *quo animo*, or intent. And he lays down this rule, on the authority of the case I have already cited, of Bolton *v.* Downham. This I apprehend to be a full recognition of the doctrine that the intent of the agreement must be found, and that where it is not apparent

on the record or face of the contract, it must be ascertained by a jury. And this is the more evident from what immediately afterwards fell from the judge. "But if," says he, "the plaintiff had traversed the plea, then the question of intent would have been for the jury." And he cites, in support of this position, the decision in Bedingfield v. Ashley, already quoted.

There is then, no other distinction in the two cases on this subject, decided by the Supreme Court of the United States, than what is to be found in the state of the pleadings. For in the case subsequent to that of the Bank v. Owens, I mean that of the Bank v. Waggener et al. Judge Story refers to the first, and remarks, that there is no distinction in the principle of the two decisions. "The demurrer in Owens' case admitted the *quo animo*," otherwise it must have been left to the jury. In Spurier v. Mayoss, 1 Ves. jr. 533, the court decide, "that to make the contract usurious, it must be apparent upon the face of it, or by evidence, that the *intention of the parties in the creation of it*, was by means of shift or device, to take more than legal interest." In Hine v. Handy, 1 J. Ch. Rep. 6, it was held that the excess over the legal rate of interest should be made a condition of the loan. In Hammet v. Yea, Eyre, Chief Justice, says, "I repeat, in conclusion, that I cannot agree, that in usury more than in any other case, the whole transaction is not to be taken together. Whether more than 5 per cent. be *intentionally taken*, is a question of fact to be decided by the jury." The principle which grows out of all these cases, I take to be that stated by Gould, J. in Murray v. Harding, "that the ground and foundation of all usurious contracts, is the *corrupt agreement*." And that the motives of the parties are to be found by the jury. There is one other case much later in point of time than most of those to which I have referred, which illustrates with such clearness and precision the true boundaries on questions of this character between the powers of the Court and those of the jury, that I cannot pass it over. It is the case of Steptoe's adm'rs. v. Harney's ex'ors. 5th Leigh's Rep. The president of the court of appeals in giving his opinion observes, "that the distinction arises out of the theoretical incapacity of the court to ascertain any fact, or to judge of any *motive*, and the power of the jury to ascertain every fact and ferret out every *motive*." A

plea of usury should therefore present such facts with certainty to every intent, as in themselves distinctly amount to an *agreement* to receive more than lawful interest, or it must state the facts with such necessary averments of an intent to evade the statute, that a jury upon the trial might decide that the agreement was a contract for usurious interest." What is here said in regard to the plea of usury, applies with equal force to a special verdict, and if the latter do not find that the contract was corrupt, the court surely cannot infer it. It is true that if the special verdict finds that there was an agreement by which the lender knowingly receives or takes illegal interest, the court may infer the intent to violate the law. But this can only be so when no other conclusion would be consistent with the facts found in the verdict. If then the verdict either negatives the corrupt motives, or finds other facts inconsistent with such motives, I know of no rule by which the court can fix the intention. In the case at bar, the record shows that the contract was to receive only 8 per cent. on the loan, which is the rate of interest allowed by the charter, on loans having more than one year to run; that the rule of computation adopted by the clerk did reserve to the bank a trifling excess over 8 per cent. and that he and the officers of the bank did know at the time that this mode would give such excess. Had the proof stopped here, the defendant might very properly assimilate it to the cases of the Bank *v.* Owens, in 2d Peters, and of Marsh *v.* Martindale, 3 Bos. & Pull. 153, and invoke the powers of the court to make an application of the doctrine there asserted. But I take it that the court is bound to connect the whole of the circumstances connected with the transaction, and thus ascertain whether the motives of the officers of the bank can be explained on any other hypothesis than a corrupt intention.

The verdict also finds that the mode of calculation has never been adopted by, or otherwise received the sanction of the directors or the stockholders of the bank, that it was adopted in this case because it had been uniformly used, it being the established custom of the bank to compute interest by Rowlett's tables, and that there was no intention to violate the law; the object, and only object being the convenience and accuracy of the rule, and that there was no design to make or gain by it. It will thus be

seen that the jury have found that there was no intention to vio-
late the law, and it has already been shown from numerous deci-
sions of the highest courts in this country and in England, that it
is their peculiar prerogative to decide the question of intent. How
then can this court be called on to infer what they have said did
not exist? It is said that where the body of the evidence shows
a taking of usurious interest with full knowledge of the fact, there
is no room for presumption; the corrupt agreement is made out.
*Res ipsa loquitur;* and that the court is bound to apply the law,
even though the jury do find, that there was no intention to vio-
late the law. That ignorance of the law will not excuse. This
is true; and the proposition runs through the whole system of
criminal jurisprudence. When a homicide is proven, the law pre-
sumes it to be felonious. It is however a mere presumption and
is open to explanation, and subject to be destroyed by proof. This
I understand is the rule in all cases of usury. It is laid down to
this extent, and no further, in the case of The Bank of Utica *v.*
Wager, 2 Cowen, 763. And I apprehend that the difference be-
tween that case, and the others, which have been decided on this
point, will be found to consist only, in different applications of
the same doctrine. When therefore the judge remarks, that "re-
ceiving usurious interest intentionally, is sufficient evidence of a
corrupt agreement;" he advanced no new doctrine. I entirely
agree with him. I only conclude that he gave it an application
in that case, which I do not feel at liberty to give it in the case at
bar. I am not willing to carry the interpretation of the usury laws
to that extent. In this case it is manifest to me that there was no
corrupt intention. That in calculating the interest, the *only ob-
ject* was convenience and accuracy, and that the sordid motive of
avarice which controls and influences the usurer, had no share in
the transaction. I come to this conclusion from two facts which
are found by the verdict. 1. That the clerk *acted in obedience to*
the uniform and long established custom of the Bank. And, 2.
The amount of the excess over the lawful interest, which is so
trifling as not to be an object to any money lender. It has been
argued that usage cannot excuse a wilful violation of the statute
laws of the country, or furnish an apology for trampling them
down. This is unquestionably true. And yet custom may go a

[Planters' Bank *v.* Snodgrass.]

great way to explain a transaction and unfold the motives of the parties to it.  As was determined by Lord Mansfield in the case of Floyer *v.* Edmonds, already cited.   In this case the motive is the gravamen of the controversy.   And surely the party who is sought to be charged on a corrupt motive, is entitled to the benefit of every circumstance which in its nature is calculated to repel the imputation.    For this purpose he may invoke the usage which influenced the obnoxious act, and ask to have it put in the balance and weighed in his favor.   The argument it furnishes is, that it is not fair to impute a wicked intention, for doing an act, which is every day committed by almost every bank, merchant, broker and business man in the United States. ˙ An act sanctioned not only by inveterate usage, long continued, and generally diffused through the operations of the almost entire banking and commercial classes of the whole country; but by a solemn legislative enactment of Congress, and of several of the states of the Union.   He may ask the benefit of the custom, for the same reason and for the same purpose, that the banker does, who takes the interest on his loans in advance.   Its influence in the latter case has never been denied, but on the contrary was admitted by Lord Mansfield in the case before noticed of Floyer *v.* Edmonds, when the question was of first impression.   He held the transaction to be usurious upon its very face, yet as the interest was discounted in pursuance of long usage in the regular course of trade and business, it would not do to hold it usurious.   This decision has been acquiesced in ever since, and is now the settled doctrine in England and in this country.   2 Wm. Black. 792; 4 Term. R. 148, 153; 15 John. Rep. 162; Bank of Utica *v.* Wager, 2 Cowen, 768; Fleckner *v.* Bank of the United States, 8 Wheat. 354; 5 Rand. Rep. 132; 1 Stewart's Ala. Rep. 469: And yet by the practice thus sanctioned as a universal rule, the banks receive on their loans $6, for every 94, when by the law they are entitled on that sum to $5 64, only.   This secures to them on every loan of $100, thirty-six cents more than the legal interest.    Whereas the rule of calculation in the present case produces a gain of 8 cents per centum only.   And if remote consequences can have any just influence in questions of this sort, they will be found to be much more alarming in the former than in the latter instance.

For by taking the interest in advance, it will be found upon a nice calculation, that if a note for $100, is made payable 16 years and eight months after date, and is discounted on the day of its date, the discount will absorb the whole amount of the note, and the lender neither advances, nor does the borrower in such case receive one cent. Yet the courts have felt themselves bound to uphold the contract in this case. And why? On the simple ground of usage. It is a clear and palpable violation of the law. And so held to be in all the cases decided upon it. It was so held by Judge Savage, in the case of the Bank of Utica *v.* Wager, and he goes on to remark, that if the question were *res integra*, he should feel bound to hold that it was so far usurious as to avoid the contract. But it had been settled and could not be overturned. When the question came before Lord Mansfield, in Floyer *v.* Edmonds, it was not *res integra*, and he sustained the contract upon the only ground on which it can be upheld by any consistent principle. And that was, that the usage being general amongst the banks, that fact explained the intent of the banker, and repelled the inference of a corrupt agreement. Why should not the same indulgence be extended to those who have in good faith acted in obedience to a custom equally as universal, much more harmless in its results, and believed to be also highly beneficial to the business part of mankind.

Banks have in most cases adopted the practice of including the day of payment fixed in the old note, in the new one upon a renewal; by which they receive double interest for that day. On the day of the date of the renewal they get 12 per cent. Every bank knows this, they then in such cases knowingly take usurious interest. And are therefore clearly within the operation of the general rule laid down in the adjudged cases, and exactly within the pale of the one asserted by Judge Savage in the case of the Bank of Utica *v.* Wager, and held to be incontrovertible "that the taking of usurious interest intentionally, was sufficient evidence of a corrupt agreement." And yet in that very case he held that this practice of the bank was not affected with usury. He concluded, however, that as the practice of counting interest on 360 days for the year, had not then received a judicial sanction, and was *res integra*, that the reservation of an excess un-

der it tainted the contract with usury. But I apprehend the principle of each case is identical—save that in the two former the sin is much more aggravated. In one, the bank takes 36 cents in every hundred‚dollars more than the law allows; and in the other, when she includes the same day in the two notes, she gets exactly two-fold interest. Yet these transactions have been universally excused by the courts on the authority of custom. Why then disregard entirely a custom by which only 8 cents per cent. is gained? Why extend the voice of pardon, to the usurer who gets double wages for his iniquity, and put all the thunders and · penalties of the violated law upon the head of him who receives by as good a title, the paltry " division of the twentieth part of‚ one poor scruple" only? I can never consent to this discrimination; when the only court in which it has been made, has furnished no better reason for it, than that the favored offenders have grown gray in the practice of their sins; or in other words, have sinned longer and sinned deeper. In several modern and some quite recent decisions upon this subject, in many of the States, this usage has been sanctioned on the analogy of the cases on the other classes. Thus, in the case of Lyon *v.* The Bank, 2 Stewart's Ala. Rep. 469, the Supreme Court of Alabama decided against the same objection. The interest in that case was counted on the rule in Rowlett's Tables, and it was urged on the authority of Wager's case in New York, that for that reason the contract was usurious. But the court gave judgment for the Bank. In the case of The Bank *v.* Hunter, 1 Devereux's Rep. 129, the Supreme Court of North Carolina had the same question before it. And they decided in favor of the Bank. The Supreme Court of Vermont as late as 1829, in the case of the Bank of Burlington *v.* Durkee *et al.* 1 Vermont Rep. has decided the same question in the same way. The court say they must sanction the usage of thirty years, and admit it to explain the *quo animo* of the parties. · The usage and the small amount of the excess, they deemed sufficient to repel the inference of a corrupt design. In the subsequent cases, of the Bank of St. Albans *v.* Scott and Raymond, 1 *Ibid.* 429, and of the same Bank *v.* Stearns, *Ibid.* 432, the Judges in Vermont re-asserted the same opinion, and gave

53*

the same judgment. It is proper to remark, also, that in each of these cases the case of Wager, in New York, was pressed upon the court, and its authority refused. The case of the Bank of North Carolina *v.* Cowen *et al.* was decided in the Court of Appeals of Virginia as late as 1837. In that case the whole subject received a full and critical investigation by the court, and they held that there was no usury in the case. It is true that Judge Brockenborough remarked that his opinion had always been opposed to the practice, and that it was a violation of the law, and that the case of the Bank of Utica *v.* Wager had greatly strengthened that impression. But he felt compelled to acquiesce in a contrary decision. And he gives a very consistent and satisfactory reason for it: " Because," he continues, " in the case of Crump *v.* Nicholas *et al.* 5 Leigh's Rep. 251, it had been decided that taking interest on 64 days in renewed notes was not usurious. That decision, he observed, was sustained on the ground of bank usage, and the great inconvenience and injury which would result from a contrary decision. He thought the analogy of that case required a similar decision. *He therefore felt bound by the usage.*"

Judge Tucker remarks, " that the idea was excellent, and the inventor of Rowlett's tables is entitled to be looked upon as a public benefactor. Time, and the most worrying labor are saved; mistakes are prevented, and the most ordinary man is enabled to make his calculations with unerring certainty. But," he continues, " these tables, unfortunately, are founded on the false postulate that the year consists of three hundred and sixty instead of three hundred and sixty-five days. A position adopted to simplify the calculations and avoid innumerable embarrassing fractional quantities." After entering into a calculation which shows an excess of one cent and a fraction on $100 for sixty days, he says, " it is impossible to consider this excess as usury." " It is not pretended, that this method of computation was used with any intent to commit usury." The statute, he says, has always been held to aim at corrupt agreements. " It is true that the taking of usurious interest is *prima facie* evidence of a corrupt agreement; but it is not conclusive. The excess was so minute, and obtained

[Planters' Bank *v.* Snodgrass.]

by a process of calculation sanctioned by so long and so general a usage of the Banks as to redeem the case from the sin of usury." I concur entirely with this reasoning.

Having settled in this manner the main question raised by the argument, it is deemed wholly unnecessary to notice the collateral inquiries dependent on it. As the verdict finds that the $2500, included in the note for expenses, was voluntarily agreed to be paid by the defendant, and was not exacted as a condition of the loan by the Bank, it cannot affect the case with usury. I am therefore of opinion that the law arising on the facts in the special verdict is with the plaintiffs.

Let the judgment be reversed, and a judgment rendered in this court accordingly.

Judge TURNER concurred.


Judge SHARKEY, dissenting, delivered the following opinion:

I regret that my understanding of the law, and its application to the case before us, lead me to a conclusion different from that of the majority of the court, and I shall endeavor to explain the grounds of my opinion.

The plaintiffs instituted this suit on a promissory note for $124,-068 and 51 cents, made by C. Dart, and endorsed by defendant, payable eighteen months after date, which was discounted by the Bank, reserving eight per cent. interest per annum, calculated at three hundred and sixty days to the year. The defence was usury. A trial was had which resulted in a verdict for the plaintiffs, but it was set aside and a new trial granted, and on the second trial the jury returned a special verdict, as follows, to wit: "We, the jury, find that the plaintiffs had, previous to the note sued on in this action, commenced several suits against C. Dart, the drawer of said note, and the defendant and one of the other drawers, on bills of exchange and promissory notes then due and protested, which suits were compromised by the plaintiffs and defendants, and the note on which this suit is founded was discounted by the Planters' Bank, in satisfaction of the amount due on them to the plaintiffs. That on said compromise the defendants allowed the sum of twenty-five hundred dollars over and above interest and costs to pay the plaintiffs' attorney's fee.

" That the nett proceeds of the note sued on was passed to the credit of said Dart, and applied to the payment of said protested paper, which nett proceeds was discounted by deducting in the calculation from the whole amount of the note eight per cent. per annum interest for the whole time said note had to run from its date to its maturity. That this interest was calculated according to the rules in Rowlett's tables for calculating Bank interest, which estimates the year at three hundred and sixty days only, and that in ascertaining the time for which interest had to be calculated on said note, the whole number of days was estimated, including three days of grace, which was five hundred and fifty-two days, and the interest reserved by such calculation was fifteen thousand two hundred and nineteen 9-100 dollars, and the sum which was by the said Bank passed to the credit of said Dart, was one hundred and eight thousand and eight hundred and forty-nine and 42-100 dollars. The mode of calculating interest which was pursued in ascertaining the interest on the note sued on, was the uniform mode of calculating interest in the Planters' Bank, and was adopted for the purposes of convenience merely, and not with any design to evade the laws of usury, or to take a greater rate of interest than allowed by the charter. The directors of the Bank knew nothing of the mode of calculating interest, and never gave any directions concerning it, but the officers of the Bank knew the mode of calculating interest pursued by the Bank gave a fraction more interest than the ordinary mode of calculating by years and months, at the rate of three hundred and sixty-five days to the year, and twelve months to the year. There was no agreement specially made by the parties on the subject of interest, nor was any thing said about it. But the calculation was made by one of the clerks, according to the custom of the Bank, and a settlement accordingly. At the maturity of the note (on the 18th December, 1836,) it was duly presented and payment demanded at the Planters' Bank of Mississippi at Natchez, which was refused, and due and legal notice given to the defendant by mail, directed to Rodney, Mississippi, which was the post-office nearest to his place of residence, and put in the post-office at Natchez in time to go out by the first mail after the payment was demanded.

" We find further, that $2500 was a sum allowed voluntarily

by the defendant, and the said sum was not exacted as a condition precedent to the settlement and discount of said note sued on in this case.

" The said note was never offered for discount at a less rate of interest than that at which it was discounted and refused.

" And no part of the note sued on, or the interest, has been paid to plaintiffs. If upon these facts the law be in favor of the plaintiffs, we find for the plaintiffs, and assess their damages at one hundred and thirty-nine thousand nine hundred and eighty-three 55-100 dollars. But if the law be in favor of the defendants, then we find for the defendants."

The question is, whether this verdict presents a usurious contract?

On both sides, the case has been argued at great length and with great ability; and, by an unbounded research, counsel have laid before us all the adjudications and learning which could in any degree tend to elucidate the several positions taken.

On the part of the plaintiffs, the argument is predicated on three questions, into which it is said the whole case is resolved, to wit: First, was the contract usurious, or in violation of the charter of the Bank? second, suppose it to have been a usurious contract, what is the effect on the whole contract; is it void, or is nothing lost but the interest? and, third, did the court err in granting the defendant a new trial?

First, then, was the contract usurious? This question cannot be satisfactorily determined, without first ascertaining what it is that constitutes usury. It is defined by counsel to be a corrupt agreement, whereby the lender receives or reserves, and the other pays or agrees to pay, a greater rate of interest than the law allows. It is said the *corrupt intent* must exist, and must have entered into the inception of the contract; and that without this ingredient usury cannot exist. This is also the definition, in substance, which is given in the books. It had its origin under the British statutes, which made the usurious contract void, and the act an offence punishable by penalties and forfeitures. It is not a crime under our statute. But to adopt the definition as applicable here, and suppose it to be a corrupt agreement to take more

interest than the law allows, this is still an unsatisfactory explanation, and before it can be properly applied to the facts of the case at bar, its constituent parts must be understood. Before we can understand the aggregate, we must understand the particular parts. What, then, is meant by *corrupt* agreement, or in what does the corruption consist? I maintain and shall endeavor to show that it consists merely in the act of *taking* illegal interest, whether it be known to be illegal or not; in other words, in taking more than eight per cent. without accident or mistake. If the lender *knows* what he does take, the offence is complete. It is *knowingly* taking, opposed to taking by accident or mistake. There is nothing else to which the term *corrupt* can be applied, for there is no moral turpitude in the mere act of taking interest; it does not evince depravity. The prohibition amongst the Jews is admitted to have been a mere political regulation, not established because the loaning at interest was contrary to natural justice. Lord Bacon, in treating the subject philosophically, after enumerating the advantages and disadvantages, comes to the conclusion that society is benefited by the loaning of money at interest; and Grotius holds that it is neither repugnant to divine nor to natural law. Nothing short of extortion or unreasonable interest is prohibited by the common law. Hence it is clear that taking of usury is *malum prohibitum,* and not *malum in se.*— When, therefore, the books speak of a *corrupt agreement,* they must be understood to mean either that the corruption consists in the commission of an act which is made a crime by the statute, or that it consists in the single fact of *knowingly* taking more than a given rate of interest. If the terms were adopted in the former sense, it can have no foundation here, because usury is not a crime; but if they are to be understood in the latter sense, then it is clear the corruption consists in doing that which is prohibited by law, whether the lender *knew* the law, or *intended* to violate it or not. The latter position I take to be the true one, and think it is abundantly sustained by adjudged cases, either directly or by legitimate deduction from the principles they establish. There is little or no difference in the authorities cited in regard to principles, and yet there is a difference in their application of them. I will notice

such of the cases as may seem to me most decisive of the question, and endeavor to fortify the position taken by such aids as they may, by a fair interpretation, afford.

In the case of the Bank of the United States *v.* Wagner, Judge Story says, "to constitute usury within the prohibitions of the law there must be an intention knowingly to contract for or take usurious interest; for if neither party intend it, but act *bona fide* and innocently, the law will not infer a corrupt agreement." The import of this language is neither obscure nor doubtful. There are two members to this sentence. By the first we are told what usury is, by the second we are told when the law will not infer it. The last does not qualify the first. The act which constitutes usury is not changed, because the law will not infer it when the parties act innocently. He says "if neither party intend it;" intend what? "knowingly to contract for or take usurious interest," of course. If illegal interest be taken, it does seem to me that according to this language, there is but one way of escaping the charge of usury, and that is by showing the absence of "an intention knowingly to contract for, or take usurious interest," and if the party had no intention knowingly to contract for it, it would seem to follow that the only other way it could happen, would be by accident or mistake. I apprehend that he did not mean to assert the proposition that the party must know that he was violating the law, but merely that he should know for what sum he contracted. He continues, "when indeed the contract upon its very face imports usury, as by express reservation of more than legal interest, there is no room for presumption, for the intent is apparent, *res ipsa loquitur*." What is it that rejects presumption? The intention knowingly to take a certain interest. If presumption is to be rejected when the facts are apparent from the contract, the case is precisely the same when they are made to appear otherwise. Whenever it is shown, therefore, that the parties acted knowingly, the law pronounces the agreement corrupt, precisely as though the intention had appeared on the face of the contract. I will here remark, that the distinction between usury and the evidences of it, must be kept in view. I am now endeavoring to ascertain what it is; when that is done, I shall endeavor to show how it is to be proved or rebutted.

In the case of Bolton *v.* Downham, the court said, "the corrupt agreement (which is confessed by the demurrer) makes it usury, and it is the intent which makes it to be so or not so." The intent here spoken of, can mean nothing more nor less than an intent to take a certain rate of interest, knowingly. An intentional taking, opposed to an accidental taking. The language of Justice Gould, in Murray *v.* Harding, is much relied on. He says, "the ground and foundation of all usurious contracts, is the corrupt agreement." This is true, but from this language we can get no idea of what it is that constitutes a corrupt agreement, and this is certainly important to be understood.

In Roberts *v.* Tremayn, a special verdict was found, from which it appeared that more than lawful interest had been taken, but it did not find the corrupt agreement. The court held this to be unnecessary, because the circumstances amounted to usury, and that they could not by intendment have any other construction. It was usury apparent. The circumstances were, that a lease had been made for a loan of money, with privilege to redeem in two years. More than 5 per cent. interest was reserved to be paid quarterly. These circumstances were said to constitute usury apparent. It was, therefore, a corrupt agreement. Why was it so? Because the fact of knowingly taking more than 5 per cent. made it so. We are told that the law will not *infer* a corrupt agreement. In this case then it was not an inference of law. There was no room for inference, the facts made it usury. From this it would seem that what is a *corrupt* agreement is a question of law.

With the case of Hammett *v.* Yea, it seems to me that I might well close the inquiry, as to what is meant by a *corrupt* agreement, for it is certainly as clear as need be. Eyre, chief justice, has placed it in language which leaves no room for doubt. He says, "I will begin with stating my assent to the proposition that where a party on a contract for a loan intentionally takes more than 5£ per cent. per annum, for forbearance of that loan, he is guilty of usury. But I add to it this further proposition, that whether more than 5£ per cent. is intentionally taken upon any contract for such forbearance, is a mere question of fact for the consideration of the jury, and must always be collected from the whole of the transaction as it passes between the parties." The

proposition to which he so unqualifiedly assents, relates merely to the constituents of usury; that which he adds, relates merely to the mode of ascertaining the intention of the parties. The latter does not, in the slightest degree, qualify the first, but as a definition of usury leaves it perfect, and in that definition there is but one point to be determined, and that is, whether the party *intended* to take more than 5 per cent. An *intentional* taking is here evidently intended to be distinguished from an accidental taking. If the party know what he is doing, it is an intentional taking, and falls precisely within this definition; but if the taking was by accident or mistake, it is not, and whether so taken by accident or mistake, is a question to be determined by the jury. An intention to violate the law certainly does not enter into either of the propositions here laid down.

In Marsh *v.* Martindale, we find usury defined in the same way. Lord Alvanley said, " that if a man agree to take more than 5 per cent. for the forbearance of money, the law declares that such an agreement is corrupt, within the statute of Anne, whether the party thought at the time that he was acting contrary to the statute or not."

The case of Childers *v.* Deane & Page, is directly to the point. The court say, " to constitute usury, there must be an *intention* to take more than legal interest. Wherever such *intention* appears in the taking more than legal interest, it is evidence of the corrupt agreement required by the statute, though the party may never have heard of the law, or may think he is steering quite clear of it." The intention is here made the foundation of the offence, and constitutes the corruption. Not an intention to violate the law; that has nothing to do with the question, and, placing that out of view, we can understand the *intention* of the party as applicable to nothing else but the mere fact of taking more than 8 per cent. interest. Taking *intentionally*, or, what is the same thing, *knowingly*, as contradistinguished from taking by accident or mistake. This is shown to be the true understanding of the decision by the subsequent language of the court. The judge says, "ignorance or mistake of law excuses no man, but a mistake of fact does excuse." From this I conclude that nothing will excuse usury but mistake of fact. If there be no mistake of

fact, but a taking intentionally or knowingly of more than 8 per cent. it is usury. To the same effect will other authorities be found, but certainly more cannot be necessary to establish the truth of the position with which I set out, to wit, that taking *knowingly*, without accident or mistake, more than 8 per cent. interest, is corrupt.

But it is said the law will not infer a corrupt agreement, and although it appears that more than legal interest has been taken, this is but *prima facie* evidence of a corrupt intent. When the fact appears on the face of the contract, or is shown by a special verdict, or admitted by a demurrer to a plea, there is no longer any room for inference of law. The law then passes judgment on the facts and pronounces the agreement corrupt. There is nothing left to infer. The law will not presume innocence when guilt is shown. But still it is insisted that all this is but *prima facie* evidence of the corrupt intent, which may be explained or rebutted. This I admit, and then the question naturally arises, how may it be explained or rebutted? To remove or do away the effect of this *prima facie* evidence, something must be shown which will amount to an excuse, and what will do this? If I am right in my first position, there is but one excuse under such circumstances, and that is mistake of fact. When the *prima facie* case is made out, it may be rebutted by showing that more than 8 per cent. was taken by accident or mistake, and it cannot be rebutted in any other way. Ignorance of the law affords no excuse, nor does want of intention to violate the law, because such an intention constitutes no ingredient in usury. And certainly it would afford no defence for the usurer to say, that although I knowingly took more than 8 per cent. I did not intend to violate the law. That instead of being a defence, would make the case conclusive, as usury, like most other things, certainly admits of positive proof. When it is shown that more than 8 per cent. was taken, that is *prima facie* evidence of usury, but when it is shown that it was *intentionally* and *knowingly* taken, that is positive proof of usury, and admits of no excuse. Two plain questions answered affirmatively must settle the question of usury. 1. Did you take more than 8 per cent. interest? and, 2. Did you know that you were taking it?

We are next to enquire what kind of *agreement* was necessary to make out a case of usury.   It is insisted that " the minds of both parties must be brought to the act, and must act knowingly and wilfully; both must concur at the time in the commission of the act."   It is difficult to perceive any good reason for a distinction between a contract for usury, and a contract for any thing else, and yet the counsel have endeavored to place it on different grounds.   In all contracts there must be an assent or meeting of the *minds* of the contracting parties, either actual or constructive. Under certain circumstances, in the absence of an express contract, the law will imply an agreement or assent of the minds, and this it will do in usurious as well as other contracts.   The customer who goes to his merchant to buy an article, is supposed to have agreed to give the selling price, although in point of fact he neither knew nor inquired the price.   The usurer who sits in his counting room with his rates upon his counter, as much exacts them as though he had done so in so many words, and his customer is supposed to assent to them, if no express contract be made, although he may never have heard of them.   It is certainly true that some of the books say that the assent of the lender is no less essential than the assent of the borrower.   Many of them, however, do not go this extent in laying down the ingredients of usury, and I do not think any of them can be justly construed as going further than I have already stated, to wit: that no other assent is necessary, than such as the law requires in any other contract, which may be either express or implied.   The conclusion of the court in the case of Smith *v.* Beach, seems to me to go a step further than the authorities, or the premises there taken will warrant.   The court say, " A corrupt agreement is necessary to constitute usury; and to form a corrupt agreement, as in all other contracts, the minds of the parties must meet.   The assent of Beach was therefore as essential to the existence of a usurious agreement, as that of Bird."   " From these premises it follows as an undeniable consequence, that there could be no corrupt agreement while either of the parties remained ignorant of the excessive reservation."   If the contract for usury was a separate and independent agreement, unconnected with the contract for the loan, this would be true; but usury is always connected with, as

a constituent part or condition in, a contract for loan. And whilst the mind assents to the contract for loan, it may be ignorant of the condition or terms. Suppose an ignorant man who knows nothing of interest or the mode of calculating, borrows money from one who does know how it is calculated, and who exacts more than legal interest, under this conclusion of the court it is difficult to perceive how this could be usury. The borrower is wholly ignorant of the excessive reservation, but the lender is not. Under the broad proposition laid down by the court, the ignorance of the borrower, would take it out of the statute against usury. As a consequence of this, a recovery could be had of course, for the taint of usury being removed, nothing could prevent a recovery. A perversion of legal principles would follow as a further consequence. The borrower who knows that an illegal reservation is made and assents to it, is protected under the usury laws; but the ignorant man who knows not what is reserved, and who of course does not assent to it, is compelled to pay the usury. The court, however, expressly stated in the outset in this case, that "to form a corrupt agreement *as in all other contracts,* the minds of the parties must meet." Now in all other contracts the minds meet expressly or impliedly, and so it is in usury. I confess myself somewhat at a loss to know why it was that the assent of the borrower was ever necessary under the statute; I mean his assent on the point of usury; his assent to the loan was of course necessary. The statute is prohibitory to the lender only, and is silent as to the borrower, and it does seem that if a case can be imagined in which more than legal interest is *knowingly* taken, without the assent or knowledge of the borrower on the point of usury, that it would be usury still.

I have thus taken the several material members or parts of the definition which has been given, and have endeavored to show the true meaning of a *corrupt agreement.* I shall now endeavor to make an application of that definition to the case before us, as disclosed by the special verdict.

It appears that interest was calculated for the whole time the note had to run, (eighteen months,) at three hundred and sixty days to the year, and that the officers of the Bank knew that this gave a fraction more than the ordinary mode of calculating at

three hundred and sixty-five days to the year.   These facts being found by the verdict, are to be considered precisely as though they had formed a part of the written contract, and must be so expounded.   Do they constitute a corrupt agreement?   They do. There is here nothing left for the law to infer; the facts are placed before the court as a part of the contract.   The intention of the lender is made apparent by the verdict, and here the maxim *res ipsa loquitur* applies.   The jury have told the court that the Bank officers knew that they were taking more than legal interest. The *intent* is found; the law pronounces a *contract* made with such intent to be corrupt.   The intention of the parties was a question of fact for the jury; the effect of contracting with such intention is a question of law for the court.   It is a question of law, because it is the law which declares that an intentional violation shall be corrupt.   Hence the court in the case of Stribbling *v.* The Bank of the Valley, 5 Randolph, 145, say, " Many cases may be cited to prove, that the facts being agreed or found, it is for the court to decide whether in law they amount to usury."   In the case of Roberts *v.* Tremayne, a special verdict was found, but it did not find that the agreement was corrupt, and for this it was insisted not to be usury, but the court held this to be unnecessary. All the circumstances were found from which the usury was apparent to the court, and which could not by intendment have any other construction.   So it may be said here; the circumstances show usury, and can have no other intendment.   The intentional taking is found, and this makes it corrupt.   The case of Marsh *v.* Martindale was also on a special verdict, in which the jury found that they believed that Sir Charles Marsh did not think that he was acting contrary to law.   The court held that there was nothing in that finding to prevent them from looking into the other facts found, and deciding it to be usury, and this is in point in the present case.   The jury present all the facts, and if they make out a case, which the law pronounces usury, it is conclusive on the party.   The same doctrine is recognized in the case of Childers *v.* Deane.   The court say, " wherever such intention appears in the taking more than legal interest, it is evidence of the corrupt agreement required by the statute."   This remark of the court is as much applicable when it appears by other means, as when it ap-

54*

[Planters' Bank v. Snodgrass.]

pears by the contract. In both instances, the statute determines by the facts; and the facts being made apparent, the conclusion of law follows. But, say the counsel, this doctrine will not apply, because the jury have found in their verdict that the Bank did not intend to violate the law, and on this branch of the finding they predicate their right to exemption. Take the previous part of the verdict alone, in which it is found that this interest was taken knowingly, and it presents a case of a corrupt agreement under the law; does the latter part of the finding excuse it? It does not. I have already shown that it is no excuse to even a *prima facie* case of usury, to show that the party did not intend to violate the law; certainly then it is immaterial whether the Bank officers intended to violate the law or not. The verdict shows more than a *prima facie* case; it shows facts which make the case conclusive. The finding is, that the officers of the Bank, knowingly took more than eight per cent. interest. To this, it is no answer to say that they did not intend to violate the charter or usury laws. The facts found constitute an agreement corrupt in law, and the judgment of law is not to be changed by finding that no violation was intended. This part of the finding presents nothing but an immaterial circumstance. The facts found are corrupt in law, and the law will hear no man urge an unintentional violation as an excuse, if he intended to do the thing which constitutes the violation. That, and that only is to be pronounced upon, whatever may have been his intention towards the law. It is the object of a special verdict to present the facts, and ask the court to pronounce the law on them. In doing this the court must disregard such circumstances as are immaterial, and of that character is that portion of the verdict which declares that the officers of the Bank did not intend to violate the law, because such a circumstance is no defence against usury.

But it is also insisted that this contract is not usurious, because the verdict shows that "there was no agreement specifically made by the parties on the subject of interest," and because interest was calculated by one of the clerks without the knowledge of the directory. This may be true, and yet it does not follow that it was not a usurious contract. It appears that this was the uniform mode of calculating interest in the Bank; as such it may be

[Planters' Bank *v.* Snodgrass.]

regarded as a condition on which every loan was made.  Being a general rule, it as much formed a part of each particular contract, on the part of the Bank, as though it had been expressly mentioned.  It was saying to every person, on these terms we discount; and adopting it as a general rule, was equivalent to an exaction in each particular case.  To contract with the Bank without a special agreement about interest, was impliedly assenting to the terms adopted.  The *aggregatio mentium* is implied from the custom of the Bank, and the acquiescence of the borrower.  A Bank contracts by its officers, and whatever they do within the scope of their authority is binding.  It appears that the interest was calculated by ⌐⌐e of the clerks, according to the custom of the Bank.  For this purpose he was the proper officer for aught that appears, and at all events he conformed to the customary mode of calculating interest in the Bank.  There can be no pretence for an escape on this ground.

Another ground is also taken on which the plaintiffs seek to repel the charge of usury.  It is said that the Bank adopted Rowlett's tables for the purpose of convenience, merely, and not with any design to evade the usury laws, or to take more interest than the charter allowed, and this being the customary mode, adopted by the Bank, it is not usury.  In the absence of law, custom or usage may serve to establish a rule which will be binding; or in some cases courts will adopt particular customs, when conformity to them operates merely as a waiver of some personal privilege; for instance, where a bank has adopted a particular mode of making demand, and giving notice of protest on promissory notes, then any one doing business with the bank is supposed to assent to such custom, and to waive the necessity of a strict conformity to law.  But where there is a positive prohibitory enactment, any custom that is in conflict with its provisions, can have no weight or force whatever.  Custom may also be resorted to in certain cases for the purpose of explaining a transaction, but even for this purpose such resort is wholly useless here, because the explanation when made, can avail nothing.  It does not explain away the only material circumstance in the case, to wit; that more than 8 per cent. was knowingly and intentionally taken.

The custom of calculating interest according to Rowlett's Tables,

[Planters' Bank *v.* Snodgrass.]

has undergone frequent adjudications, and these adjudications are relied on by the counsel in support of their case. The principal one is the manuscript decision of the court of appeals of Virginia. Judge Tucker, who has discussed the question more at length than any of the other judges, yields his assent to this proposition, "that if the lender is aware that he is getting more (than legal interest) although he may *suppose* that he is not infringing the statute, yet he is guilty of the offence." The language immediately following seems to me to be irreconcileable in principle with the preceding proposition. He continues, "but where there is obviously no intent to infringe the statute, I cannot think it just to consider as usury, the taking even with full knowledge, of "the twentieth part of one poor scruple" more than at the rate of six per cent." 1 would cheerfully agree with His Honor as to the justice of the case he puts, but I cannot think that I have any right to *determine* on the justice of the case. The law settles that for me. He further says, "the statute has always been construed to aim at corrupt agreements for usury," and his determination is, that although more than six per cent. was knowingly taken, that it was not usury. The inference is irresistible, that the excess was considered too small to constitute a corrupt agreement. Now, I cannot perceive how the amount can change the principle. The law certainly never intended that the question of usury should be determined by a judge's notions of justice. The law says that no more than a certain rate shall be taken, and if *any* excess be taken the law is violated, and it pronounces the agreement corrupt. It is violated by "the taking of the twentieth part of one poor scruple," "nay, if the scale do turn but in the estimation of a hair," it is corrupt; the line fixed, is broken. Our particular notions of justice would be rather an uncertain standard for the determination of the question of usury. This decision does not stand alone. Similar decisions have been made in several other states, but the current is not unbroken. Opposed to them are the decisions of the Supreme Court of New York. The cases of New York Firemen's Insurance Company *v.* Ely, and the Bank of Utica *v.* Wager, 2 Cowen, are both directly in point. Interest had been calculated, as in the present case, at 360 days to the year, and for this reason the contracts were held to be usurious. These cases

decide that no Bank can establish a custom which will authorise it to take more than legal interest, and that the amount of the excess is wholly immaterial; that any excess, however small, will be usury. And so in the case of the Agricultural Bank *v.* Bissell, 12 Pick. Rep. the court say that if more than legal interest be taken by design, " or if done in pursuance of the adoption of a principle of computation, which would give more than the legal rate, we are not prepared to say that it would not be usurious, however small the excess over the legal rate." In all the cases decided under Rowlett's Tables, the notes have been made payable in less time than a year, the most of them in sixty days, and hence there is great reason for the decisions, for the law always disregards the fractions of a day. The year, consisting of 365 days, cannot be exactly divided without running into fractions of a day, and under the rules of law, as the precise time cannot be ascertained, that rule which comes nearest to it may be adopted with propriety. But this reason does not hold in the present case, because the note did not mature in a fraction of a year, but had a year and a half to run, so that really we have no case strictly analagous.

The principles laid down by the court in the case of the Agricultural Bank *v.* Bissel, applied to this case, show the contract to have been usurious. On the whole view of the case, I can perceive nothing to exempt it from the operation of the statute.— Divested of all immaterial circumstances, it is briefly this. The Bank adopted a rule for computing interest, *knowing* that it would give more interest than the law allowed. They contracted with Dart for a loan, and calculated the interest according to the rule adopted, and reserved the interest; or, in other words, the Bank, on a contract for a loan, knowingly and intentionally took more than 8 per cent. interest; was it usury or was it not? How much more was taken I know not; nor is this material. Suppose, therefore, I make another statement of the case. The Planters' Bank, on a contract for loan, knowingly and intentionally took twenty-five per cent. interest; is it usury or is it not? To say that it is not, would be a startling assertion; and yet on principle it seems to me to be quite as sustainable as the point before us, for I have certainly shown from authority that the amount of excess makes no difference; and if the Bank may

[Planters' Bank *v.* Snodgrass.]

establish a rule of computation which will give a fraction more than 8 per cent. why may it not establish one which will give 25 per cent.? And if the Bank may establish its rates of interest, and make them binding by custom, why may not every broker, every merchant, and every tradesman do the same thing; and if all this could be done, of what avail is the usury laws? To establish that they are abrogated by custom in one instance, is to render them null and void; for if the door be open to encroachment, adventurers will not be wanting.

I have thus disposed of the first question made in the argument, and as this is the one on which the decision of a majority of the court mainly turns, it is unnecessary for me to extend the investigation beyond it. For the same reason, it is unnecessary for me to determine whether the contract in the case of the Bank of the United States *v.* Watson, submitted with this, is void, because more interest was taken than the charter allows. I will only say that on this point there is some confliction in the authorities. In the case of the Bank of Utica *v.* Wager, Judge Savage held that although a Bank took more interest than the charter allowed, yet if the excess did not amount to a violation of the usury law, the contract was not thereby made void. This question, however, was not before the court, and the remark was but incidentally made. A similar opinion was given in the case cited from 1 Stewart. The only case in which the point has been directly made and decided, is that of the Bank of the United States *v.* Owens, 2 Peters. The question was discussed at length by the supreme court, and the contract held to be void, because the Bank had taken a greater rate of interest than that allowed by the charter. This authority would seem to be decisive of the question before us, for two reasons: 1st, it is the only case in which the question has been directly considered; and, 2d, because it was a decision made on the same charter, under which the interest in this case was taken. And this decision was afterwards reviewed by Judge Story, in the case of the Bank of the United States *v.* Wagner, and, so far at least as this question is concerned, it was adhered to.